1

2                                                    13 SEP 20 PM 4:49

3

4              ORDeRed unsealed on

5              9/23/13 WAH

6                    SEALED

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10                     February 2012 Grand Jury

11   UNITED STATES OF AMERICA,        Case No.  **13 CR 3487 H**

12            Plaintiff,              I N D I C T M E N T

13        v.                         Title 15, U.S.C., Secs. 78j(b),
                                     78ff, and Title 17, C.F.R.,
14   JING WANG (1),                  Sec. 240.10b-5 – Securities Fraud
     BING WANG (2),                  (Insider Trading); Title 18,
15        aka Bin Wang,              U.S.C., Sec. 371 – Conspiracy;
                                     Title 18, U.S.C., Sec. 1512(c)(2)
16        Defendants.                and (c)(1) – Obstruction of
                                     Official Proceeding; Title 18,
17                                   U.S.C., Sec. 1956(a)(1)(B)(i) –
                                     Money Laundering; Title 18, U.S.C.,
18                                   Sec. 1028A(a)(1) – Aggravated
                                     Identity Theft; Title 18, U.S.C.,
19                                   Sec. 2 – Aiding and Abetting;
                                     Title 18, U.S.C., Secs. 982(a)(1),
20                                   and 981(a)(1)(C) and Title 28,
                                     U.S.C., Sec. 2461(c) – Criminal
21                                   Forfeiture.

22        The grand jury charges, at all times material:

23                   **INTRODUCTORY ALLEGATIONS**

24        1.   Defendant JING WANG was a senior executive at Qualcomm,

25   Inc. ("Qualcomm"), a wireless technology company headquartered in

26   San Diego, California.  Qualcomm was one of the world's largest

27   companies and an "issuer" of securities under the federal

28   securities laws.  Qualcomm's shares of common stock were traded on

EB:nlv:San Diego
9/20/13                              1  WAH

1   the NASDAQ Stock Exchange under the symbol "QCOM."  JING WANG was
2   trained as a lawyer in China, received an LL.M from the University
3   of Virginia School of Law, and worked for several years at a
4   Washington, D.C. law firm.

5       2.  Defendant BING WANG was the brother of defendant JING
6   WANG and lived in China.  During the time that JING WANG worked at
7   Qualcomm, BING WANG was a local government official in Anhui
8   Province, China.

9       3.  Coconspirator-1 ("CC-1") was a registered representative
10  of Merrill Lynch in San Diego, California and, between 2007 and
11  2013, held several positions including Vice President, Senior Vice
12  President, and International Wealth Management Advisor.  From 2005
13  through 2013, CC-1 worked as JING WANG's Financial Advisor.

14      4.  In or about January 2008, JING WANG was promoted from
15  Senior Vice President to Executive Vice President at Qualcomm, and
16  joined Qualcomm's Executive Committee.  From that point forward,
17  Qualcomm designated JING WANG as an "officer" of an "issuer" under
18  Section 16 of the Securities Exchange Act of 1934.  Because of JING
19  WANG's senior position at Qualcomm, he was subject to certain
20  restrictions involving the purchase and sale of Qualcomm
21  securities, in part due to his access to confidential business
22  information.  At the time of JING WANG's elevation to Executive
23  Vice President, and repeatedly thereafter, Qualcomm notified JING
24  WANG and CC-1 of the restrictions on JING WANG's stock trading.

25          JING WANG's Secret Offshore Corporation and Account
26      5.  In or about March 2006, JING WANG discussed with CC-1 a
27  planned sale of Qualcomm stock options and how to set up an account
28  that would allow JING WANG to disguise his involvement in

transferring funds to people in China.  CC-1 advised JING WANG that an offshore entity in the British Virgin Islands ("BVI") could be created to act as a nominee account holder of JING WANG's funds. This would allow JING WANG to disguise his true ownership and control of these assets and conceal transfers from U.S. tax authorities and third parties.  JING WANG instructed CC-1 to begin the process of setting up such an offshore, nominee account in the BVI.

6.  In or about March 2006, CC-1 presented JING WANG with a list of available BVI companies and JING WANG selected "Unicorn Global Enterprises, Ltd." ("Unicorn") as his nominee company.  JING WANG instructed CC-1 to set up Unicorn in the BVI, and make it appear that JING WANG's brother in China, BING WANG (aka Bin Wang), was the beneficial owner of the company.

7.  In or about March 2006, CC-1 opened a new Merrill Lynch brokerage account for the benefit of (and under the control of) JING WANG but with Unicorn's name (the "Unicorn Account").  JING WANG provided documents to CC-1 that gave the false impression that BING WANG would be the beneficial owner of the Unicorn Account. CC-1 used these documents to open a Merrill Lynch brokerage account for Unicorn, thereby making it appear that JING WANG had no interest in the Unicorn Account.  In truth, however, JING WANG funded the Unicorn Account, controlled all transactions in the account, transferred funds from the account for his own benefit, and provided to CC-1 any documents purportedly bearing BING WANG's signature that were needed for the account.

//

//

3

8.   On or about April 26, 2006, JING WANG transferred $360,000 in Qualcomm stock-option proceeds from a Merrill Lynch account he controlled to the Unicorn Account.

9.   Between in or about May 2006 and in or about March 2012, JING WANG directed CC-1 to conduct transactions in the Unicorn Account.   These transactions included, among others, transfers totaling $95,000 to a Qualcomm employee in China ("Employee A") for JING WANG's benefit.   For example, while in China on business, JING WANG would periodically ask Employee A to exchange the U.S. Dollar funds he had sent to Employee A into Chinese currency and to deliver the Chinese currency to JING WANG at Qualcomm's offices in China.

10.   Between in or about 2006 and in or about 2011, CC-1 would periodically meet with JING WANG at his Qualcomm office to review investments controlled by JING WANG and to provide JING WANG with copies of documents summarizing the performance of his various accounts at Merrill Lynch, including the Unicorn Account.

Inside Information #1: Qualcomm's Dividend and Stock Buyback

11.   On or before March 1, 2010, because of his role as an Executive Vice President of Qualcomm, JING WANG learned material, non-public information – that is, that Qualcomm planned to announce (1) an increase in its quarterly cash dividend and (2) a $3 billion stock repurchase program (collectively "Inside Information #1"). Inside Information #1 was discussed, among other times, in San Diego at a closed meeting of Qualcomm's Board of Directors on March 1, 2010, which JING WANG attended.

12.   On or about March 1, 2010, soon after Inside Information #1 was discussed at the Qualcomm Board meeting, JING WANG called

4

CC-1 from a cell phone that had a China-based phone number. During this call, JING WANG directed CC-1 to purchase as many shares of Qualcomm stock as possible using the Unicorn Account.

13. Soon after receiving JING WANG's instructions, CC-1 purchased 7,700 shares of Qualcomm stock in the Unicorn Account at $36.07 per share, for a total price of approximately $277,739. This trade by JING WANG violated Qualcomm's Insider Trading policy, as the company's "trading window" was closed and JING WANG was not permitted to execute trades in Qualcomm stock during this time. Both JING WANG and CC-1 knew that JING WANG was required to report his trades in Qualcomm stock to the company (pursuant to corporate policy) and to the U.S. Securities and Exchange Commission ("SEC") (pursuant to federal securities law). In violation of these requirements, and in contrast to previous trading in Qualcomm stock by JING WANG, both CC-1 and JING WANG did not report this trade to Qualcomm and the SEC.

14. When the market closed on March 1, 2010, Qualcomm stock traded at approximately $35.56 per share. After the close of trading, Qualcomm publicly released Inside Information #1 regarding the increase in its quarterly cash dividend and its $3 billion stock repurchase program. By the end of the next trading day (March 2, 2010), Qualcomm's stock price had appreciated to $37.93 per share. By the end of the week, Qualcomm stock had traded as high as $39.50 – an increase of over 10% from the pre-announcement price.

Inside Information #2: Qualcomm's Acquisition of Atheros

15. On or before October 4, 2010, because of his role as an Executive Vice President of Qualcomm, JING WANG learned material,

non-public information – that is, that Qualcomm intended to make a confidential offer to purchase another publicly traded company called Atheros Communications, Inc. ("Inside Information #2"). At the time, Atheros Communications, Inc. ("Atheros") was a technology company headquartered in California that was an "issuer" of securities under the federal securities laws and listed on the NASDAQ Stock Exchange under the symbol "ATHR."

16. On or about November 1, 2010, JING WANG met CC-1 at a restaurant in or near La Jolla, California, and told CC-1 of his interest in purchasing shares in Atheros. JING WANG told CC-1 that if Atheros and Qualcomm stock reached certain prices, CC-1 should sell all the Qualcomm stock JING WANG held in the Unicorn Account and use the proceeds to purchase as many shares of Atheros stock as possible. CC-1 followed JING WANG's instructions and entered the orders in Merrill Lynch's trading system, but, pursuant to JING WANG's instructions, cancelled the orders before Qualcomm or Atheros had reached the specified prices.

17. On or about December 1, 2010, JING WANG directed CC-1 to sell all of the Qualcomm stock held in the Unicorn Account and to use the proceeds to purchase as many shares of Atheros common stock as possible. JING WANG told CC-1 to make preparations for the purchase of Atheros, but not to buy it yet; rather, JING WANG would contact CC-1 again in the near future and tell CC-1 when to purchase the Atheros stock. JING WANG suggested that CC-1 should also consider purchasing shares of Atheros.

18. On or about December 2, 2010, as instructed by JING WANG, CC-1 sold all 7,700 shares of Qualcomm stock held in JING WANG's Unicorn Account at $48.37 per share ($372,449), resulting in ill-

gotten gains to JING WANG of approximately $94,710 from the March 1, 2010 purchase of Qualcomm stock. Again, in violation of JING WANG's obligations and contrary to their previous practice, CC-1 and JING WANG concealed the sale by failing to notify Qualcomm or the SEC of JING WANG's sale of Qualcomm stock.

19. On or about December 4, 2010, JING WANG travelled from San Diego to Hong Kong, China, to attend a meeting of Qualcomm's Board of Directors.

20. On or about December 6, 2010 (Hong Kong Time), JING WANG participated in the Qualcomm Board meeting in Hong Kong. During this closed meeting, Qualcomm's Board of Directors discussed Inside Information #2, and authorized Qualcomm to make a firm offer to purchase Atheros for $45 per share.

21. On or about December 6, 2010 (Pacific Time), after the Qualcomm Board meeting, JING WANG placed a call to CC-1, who was in the San Diego area. JING WANG instructed CC-1 to go ahead with the plan they had discussed a few days earlier - that is, to purchase as many shares of Atheros stock as possible in the Unicorn Account.

22. On or about December 6, 2010 (Pacific Time), CC-1 followed JING WANG's instructions and purchased a total of 10,800 shares of Atheros stock in JING WANG's Unicorn Account: 100 shares at $34.16 per share ($3,416), and 10,700 shares at $34.28 per share ($366,796).

23. On or about December 7, 2010, Qualcomm confidentially notified senior executives at Atheros of Qualcomm's offer to acquire Atheros at $45 per share. The offer was accepted by Atheros, and the companies conducted non-public due diligence of

each other with a view towards announcing the acquisition by early 2011.

24. On January 4, 2011, at 3:00 p.m. Eastern Time, the New York Times published an on-line article entitled "Qualcomm Is Said to Be Set to Buy Atheros for $3.5 Billion." The next day, on January 5, 2011, Qualcomm publicly announced that it would be acquiring Atheros for $45 per share, thereby disclosing Inside Information #2. Between the close of trading on January 3, 2011 (the day before the New York Times report) and the close of trading on January 5, 2011 (the first full day of trading after the New York Times report), the price of Atheros stock jumped from approximately $37 to approximately $44.50 – an increase of approximately 20%.

25. On or about January 10, 2011, CC-1 spoke to JING WANG about JING WANG's purchase of Atheros stock, and they discussed that both JING WANG and CC-1 could get in trouble because of this trade. During this conversation, JING WANG sought to have the Atheros trades deleted from the records of Merrill Lynch. JING WANG told CC-1 he would contact him again with instructions as to their next steps.

Inside Information #3: Qualcomm's Earnings Announcement

26. On or before January 25, 2011, because of his position as an Executive Vice President of Qualcomm, JING WANG learned material, non-public information – that is, that Qualcomm planned to announce record financial results for the first fiscal quarter of 2011 and to raise fiscal guidance for the remainder of 2011 ("Inside Information #3").

27.   On or about January 25, 2011, shortly before Qualcomm publicly announced Inside Information #3, JING WANG directed CC-1 to sell all 10,800 shares of Atheros stock in JING WANG's Unicorn Account.   CC-1 executed the trade at $44.60 per share ($481,680), resulting in ill-gotten gains to JING WANG of approximately $111,468 from the December 6, 2010 purchase of Atheros stock.   JING WANG also instructed CC-1 to use the proceeds of the Atheros sale to purchase shares of Qualcomm stock.   CC-1 followed this instruction, buying 9,450 shares of Qualcomm stock in the Unicorn Account, at $50.88 per share ($480,816).   JING WANG's purchase of Qualcomm stock occurred during a blackout period, and both CC-1 and JING WANG concealed this trade by not reporting it to Qualcomm or the SEC.

28.   On or about January 26, 2011, after the close of trading, Qualcomm announced Inside Information #3 in the form of a press release touting "Record First Quarter Results" and "Raising Fiscal 2011 Guidance."   Qualcomm's stock price increased because of the public disclosure of Inside Information #3, and closed on January 27, 2011, at $54.90 per share.

29.   On or about January 28, 2011, personnel at Merrill Lynch asked CC-1 about the large purchase of Qualcomm stock in the Unicorn Account two days earlier, and asked whether the client had any relation to Qualcomm or knew anyone at the company.   Consistent with their previous decisions, JING WANG and CC-1 agreed to obstruct such inquires and conceal JING WANG's control of the Unicorn Account and his illegal insider trading.   In furtherance of this decision, CC-1 provided false and misleading information to

Merrill Lynch about JING WANG's actual ownership and control of the Unicorn Account.

30. On or about December 27, 2011, JING WANG sold his 9,450 shares of Qualcomm stock at $54.90 per share ($518,805), yielding him ill-gotten gains of approximately $37,989 from the January 25, 2011 purchase of Qualcomm stock.

The Investigation of Qualcomm and JING WANG

31. In or about July 2010, the SEC opened a formal investigation into alleged misstatements in the financial reports of Qualcomm. By April 2011, the SEC's investigation had expanded into potential violations of the Foreign Corrupt Practices Act ("FCPA").

32. On or about August 1, 2011, pursuant to its formal investigation, the SEC issued a subpoena to JING WANG, directing him to produce, among other things, his financial institution and brokerage account numbers, as well as the institution names and names of any accounts held in his name (jointly or otherwise), held in trust for him, in which he had a direct or indirect beneficial interest, or over which he exercised control.

33. In or about January 2012, JING WANG provided CC-1 with the forged signature of JING WANG's mother in China, and other means of identification of JING WANG's mother, in order to create another BVI shell company called "Clearview Resources, Ltd." ("Clearview"). Using this information and without contacting JING WANG's mother, CC-1 created a nominee brokerage account for JING WANG in the name of Clearview (the "Clearview Account"), in part to further distance JING WANG from the illegal trades in the Unicorn Account.

34.   From on or about February 23, 2012, through on or about March 5, 2012, JING WANG caused CC-1 to transfer over $525,000 – almost the entire balance of the Unicorn Account – from the Unicorn Account to the Clearview Account.

35.   In or about April and May 2012, JING WANG notified CC-1 of the risk that his insider trading would be discovered by investigators, including the SEC, and convinced CC-1 to conceal evidence of JING WANG's illegal activity and help JING WANG procure false testimony and other evidence from his brother in China, BING WANG.

36.   On or about May 21, 2012, Qualcomm placed JING WANG on administrative leave.   The Audit Committee of Qualcomm's Board of Directors later engaged a law firm ("Law Firm #1") to perform a separate internal investigation into potential FCPA violations.

37.   In or about March and April 2013, JING WANG provided false and misleading information to representatives of Law Firm #1, and caused an individual to provide false and misleading information to representatives of Law Firm #1, knowing that this information would be provided to the SEC and criminal investigators.

Count 1 – Securities Fraud (Insider Trading)

(15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5)

38.   The introductory allegations contained in paragraphs 1 through 37 of this Indictment are realleged as if fully set forth herein.

39.   On or about March 1, 2010, within the Southern District of California and elsewhere, defendant JING WANG willfully and knowingly, directly and indirectly, by the use of the means and

11

instrumentalities of interstate commerce and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices and schemes to defraud; (b) making untrue statements of material facts and omitting to state material facts; and (c) engaging in acts, practices, and courses of business which operated as a fraud and deceit upon any person – to wit, on the basis of Inside Information #1 that JING WANG used in breach of: (a) the fiduciary duty of trust and confidence owed directly, indirectly and derivatively to Qualcomm, its shareholders, and any other source of Inside Information #1; (b) the expectations of confidentiality of Qualcomm; and (c) Qualcomm's written policies regarding the use and safekeeping of confidential and material, nonpublic information, JING WANG executed and caused CC-1 to execute the purchase of 7,700 shares of Qualcomm stock in the Unicorn Account.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

<u>Count 2 – Securities Fraud (Insider Trading)</u>

(15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5)

40.   The introductory allegations contained in paragraphs 1 through 37 of this Indictment are realleged as if fully set forth herein.

41.   On or about December 6, 2010, within the Southern District of California and elsewhere, defendant JING WANG willfully and knowingly, directly and indirectly, by the use of the means and

12

instrumentalities of interstate commerce and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5, by: (a) employing devices and schemes to defraud; (b) by making untrue statements of material facts and omitting to state material facts; and (c) engaging in acts, practices, and courses of business which operated as a fraud and deceit upon any person - to wit, on the basis of Inside Information #2 that JING WANG used in breach of: (a) the fiduciary duty of trust and confidence owed directly, indirectly and derivatively, to Qualcomm, its shareholders, and any other source of Inside Information #2; (b) the expectations of confidentiality of Qualcomm; and (c) Qualcomm's written policies regarding the use and safekeeping of confidential and material, nonpublic information, JING WANG executed and caused CC-1 to execute the purchase of 10,800 shares of Atheros stock in the Unicorn Account. All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

Count 3 - Securities Fraud (Insider Trading)

(15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. § 240.10b-5)

42. The introductory allegations contained in paragraphs 1 through 37 of this Indictment are realleged as if fully set forth herein.

43. On or about January 25, 2011, within the Southern District of California and elsewhere, defendant JING WANG willfully and knowingly, directly and indirectly, by the use of the means and

13

1  instrumentalities of interstate commerce and of the facilities of
2  national securities exchanges, in connection with the purchase and
3  sale of securities, did use and employ manipulative and deceptive
4  devices and contrivances, in violation of Title 17, Code of Federal
5  Regulations, Section 240.10b-5 by: (a) employing devices and
6  schemes to defraud; (b) by making untrue statements of material
7  facts and omitting to state material facts; and (c) engaging in
8  acts, practices, and courses of business which operated and would
9  operate as a fraud and deceit upon any person - to wit, on the
10 basis of Inside Information #3 that JING WANG used in breach of:
11 (a) the fiduciary duty of trust and confidence owed directly,
12 indirectly and derivatively, to Qualcomm, its shareholders, and any
13 other source of Inside Information #3; (b) the expectations of
14 confidentiality of Qualcomm; and (c) Qualcomm's written policies
15 regarding the use and safekeeping of confidential and material,
16 nonpublic information, JING WANG executed and caused CC-1 to
17 execute the purchase of 9,450 shares of Qualcomm stock in the
18 Unicorn Account.
19 All in violation of Title 15, United States Code, Sections 78j(b)
20 and 78ff, and Title 17, Code of Federal Regulations,
21 Section 240.10b-5, and Title 18, United States Code, Section 2.
22             Count 4 (Conspiracy to commit offenses)
23                      (18 U.S.C. § 371)
24     44. The introductory allegations contained in paragraphs 1
25 through 37 of this Indictment are realladed as if fully set forth
26 herein.
27     45. Beginning no later than January 2011, and continuing
28 through at least May 2013, within the Southern District of

                              14

California and elsewhere, defendants JING WANG and BING WANG, aka Bin Wang, knowingly and willfully conspired and agreed together and with each other, with CC-1, and with others, to commit offenses against the United States, to wit:

   a.   To corruptly obstruct, influence, and impede any official proceeding, and attempt to do so, in violation of Title 18, United States Code, Section 1512(c); and

   b.   To knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, while knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

   c.   To knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

## Manner and Means

46.   It was part of the conspiracy that the conspirators would attempt to conceal evidence of JING WANG's illegal insider trading by falsely claiming that BING WANG had authorized the opening of

the Unicorn Account, had controlled the account, and had placed the illegal trades in Atheros and Qualcomm.

47. It was further part of the conspiracy that CC-1 would provide false and misleading information to Merrill Lynch, and alter records at Merrill Lynch, in order to conceal JING WANG's control of, and trades in, the Unicorn Account.

48. It was further part of the conspiracy that JING WANG would attempt to conceal the Unicorn records previously provided to him by CC-1 by removing the records from his Qualcomm office and instructing CC-1 to take the records to BING WANG in China.

49. It was further part of the conspiracy that JING WANG would instruct CC-1 to travel to China to meet with BING WANG, and to practice the false cover story with BING WANG so BING WANG would be prepared to recite these lies to government authorities.

50. It was further part of the conspiracy that BING WANG would meet with CC-1 in China, take the documents belonging to JING WANG relating to Unicorn from CC-1, and rehearse the false cover story JING WANG had concocted about the Unicorn Account.

51. It was further part of the conspiracy that JING WANG and CC-1 would transfer the proceeds of JING WANG's insider trading to another nominee account in a manner designed to conceal JING WANG's control of these funds.

52. It was further part of the conspiracy that the conspirators would attempt to wire transfer sums in excess of $10,000 to other accounts - including an account in China - in order to conceal and transfer the proceeds of JING WANG's insider trading.

53. It was further part of the conspiracy that the conspirators would create and send false emails between each other in order to support the fake story that JING WANG had fabricated concerning the illegal trades in the Unicorn Account.

54. It was further part of the conspiracy that when questioned by law enforcement or attorneys working on behalf of Qualcomm or its Audit Committee, JING WANG and CC-1 would provide false and misleading information, and cause others to provide false and misleading information, in an attempt to prevent detection of JING WANG's use of the Unicorn Account to commit illegal activity.

## Overt Acts

55. On or about the dates set forth below, in the Southern District of California and elsewhere, JING WANG, BING WANG, CC-1 and others committed the following overt acts, and others, in furtherance of the conspiracy:

a. In or about January 2011, JING WANG asked CC-1 to assist him by concealing JING WANG's control of the Unicorn Account and his purchase of Atheros stock.

b. In or about January 2011, CC-1 falsely represented to Merrill Lynch compliance employees that the nominal owner of the Unicorn Account (BING WANG) had no relation to anyone at Qualcomm.

c. In or about February 2011, JING WANG asked whether Merrill Lynch had discovered JING WANG's illegal trades in the Unicorn Account.

d. In or about January 2012, JING WANG forged the signature of his mother, and used other means of

identification of his mother, to create false documents to be used to set up Clearview.

e.   In or about January 2012, JING WANG directed CC-1 to use false documents to set up Clearview in the BVI, in part to obscure any connection between JING WANG and the proceeds of JING WANG's insider trading.

f.   On or about January 23, 2012, at JING WANG's direction, CC-1 created a nominee brokerage account for JING WANG called the Clearview Account, in part to further distance JING WANG from the illegal trades in the Unicorn Account.

g.   In or about February 2012, JING WANG caused BING WANG to be added as a representative of Clearview to further conceal JING WANG's control of these funds.

h.   In or about February 2012, JING WANG directed CC-1 to contact a friend in China and arrange for a transfer of funds from the Clearview Account to an account in China.

i.   On or about February 23, 2012, following JING WANG's instructions, CC-1 transferred $200,000 from the Unicorn Account to the new Clearview Account.

j.   On or about February 28, 2012, following JING WANG's instructions, CC-1 transferred $200,000 from the Unicorn Account to the Clearview Account.

k.   On or about March 5, 2012, following JING WANG's instructions, CC-1 transferred $125,481 from the Unicorn Account to the Clearview Account and closed the Unicorn Account.

l.  On or about March 19, 2012, following JING WANG's instructions, CC-1 transferred $47,468 from the Clearview Account to an account in China.

m.  In or about March 2012, JING WANG met with CC-1 and explained that the SEC was investigating Qualcomm regarding corrupt payments to foreign officials.  He expressed concerns to CC-1 that the SEC would learn about his control of the Unicorn Account and his insider trading.  Due to these concerns, JING WANG embellished their false cover story about the trading in the Unicorn Account – that is, that BING WANG owned and controlled the Unicorn Account and had ordered all of the trades.  JING WANG asked CC-1 to tell this false story if he was ever asked about the Unicorn Account or the trades in the account.

n.  In or about April 2012, JING WANG met with CC-1 and gave CC-1 an envelope of documents related to Unicorn and the Unicorn Account, directed CC-1 to take the Unicorn documents to China to give to BING WANG, and instructed CC-1 to review with BING WANG the false cover story they had concocted.

o.  In or about April 2012, JING WANG instructed CC-1 to coordinate future purchases of securities with BING WANG, and to fabricate evidence in order to make it appear as if BING WANG had opened and always controlled the Unicorn and Clearview Accounts.

p.  In or about May 2012, following JING WANG's instructions, CC-1 traveled with the Unicorn documents from San Diego to Beijing, China.

q.   In or about May 2012, CC-1 and BING WANG met in Beijing and discussed the plan and false cover story that JING WANG had devised.

r.   In or about May 2012, CC-1 gave BING WANG the Unicorn documents that JING WANG had removed from his Qualcomm office.

s.   In or about May 2012, BING WANG and CC-1 sent emails to each other that contained false and misleading statements about the Unicorn and Clearview Accounts.

t.   In or about July 2012, CC-1 accessed Merrill Lynch's computer system and removed the Unicorn and Clearview Accounts from the list of accounts associated with JING WANG.

u.   In or about October 2012, CC-1 again met with BING WANG in China to discuss the false cover story that JING WANG had concocted to conceal his insider trading.

v.   In or about January and February 2013, CC-1 discussed with BING WANG and JING WANG the transfer of over $10,000 from the Clearview Account to another account in China.

w.   On or about February 20, 2013, acting consistently with previous requests from JING WANG to conceal JING WANG's involvement in the Unicorn Account in response to any investigation, CC-1 made several false and misleading statements about the Unicorn Account to Special Agents of the Federal Bureau of Investigation.

x.   On or about March 21, 2013, JING WANG made false and misleading statements to representatives of Law Firm #1 about his use and control of the Unicorn Account.

y.   On or about April 2, 2013, JING WANG caused an individual to provide false and misleading information to Law Firm #1 about JING WANG's use and control of the Unicorn Account.

All in violation of Title 18, United States Code, Section 371.

## Count 5 - Obstruction of Official Proceedings

(18 U.S.C. § 1512(c)(2))

56.   The introductory allegations contained in paragraphs 1 through 37 of this Indictment are reallaged as if fully set forth herein.

57.   In or about April 2012, within the Southern District of California and elsewhere, defendant JING WANG did corruptly obstruct, influence, and impede an official proceeding - that is, a formal SEC investigation, a proceeding before a court of the United States, and a proceeding before a Federal grand jury - and attempt to do so, by (1) removing documents related to the Unicorn Account from his office at Qualcomm; (2) providing the Unicorn documents to CC-1; (3) instructing CC-1 to take the documents to China and give them to BING WANG; (4) further developing the false cover story that JING WANG had previously devised; and (5) arranging for BING WANG to meet with CC-1 in China to prepare BING WANG to provide false statements to any authorities inquiring about the Unicorn Account.

All in violation of Title 18, United States Code, Sections 1512(c)(2) and 2.

//

//

//

## Count 6 - Obstruction of Official Proceedings

### (18 U.S.C. § 1512(c)(1))

58.  The introductory allegations contained in paragraphs 1 through 37 of this Indictment are realleged as if fully set forth herein.

59.  In or about April 2012, within the Southern District of California and elsewhere, defendant JING WANG did corruptly conceal records and documents, and attempted to do so, with the intent to impair their integrity and availability for use in an official proceeding - that is, a formal SEC investigation, a proceeding before a court of the United States, and a proceeding before a Federal grand jury.

All in violation of Title 18, United States Code, Sections 1512(c)(1) and 2.

## Count 7 - Obstruction of Official Proceedings

### (18 U.S.C. § 1512(c)(2))

60.  The introductory allegations contained in paragraphs 1 through 37 of this Indictment are realleged as if fully set forth herein.

61.  On or about March 21, 2013, within the Southern District of California and elsewhere, defendant JING WANG did attempt to obstruct, influence and impede an official proceeding - that is, a formal SEC investigation, a proceeding before a court of the United States, and a proceeding before a Federal grand jury - by falsely stating to a representative of Law Firm #1 that: (1) BING WANG, and not JING WANG, had made a $50,000 wire transfer to Employee A from BING WANG's company account; (2) JING WANG had no interest in the Unicorn Account; (3) CC-1 and BING WANG had set up the Unicorn

22

1  Account; (4) BING WANG, and not JING WANG, had exercised control
2  over the Unicorn Account; and (5) JING WANG had not purchased
3  Atheros stock prior to Qualcomm's acquisition.

4  All in violation of Title 18, United States Code,
5  Sections 1512(c)(2) and 2.

6  <u>Count 8 - Obstruction of Official Proceedings</u>

7  (18 U.S.C. § 1512(c)(2))

8  62.  The introductory allegations contained in paragraphs 1
9  through 37 of this Indictment are realleged as if fully set forth
10 herein.

11 63.  On or about April 2, 2013, within the Southern District
12 of California and elsewhere, defendant JING WANG did attempt to
13 obstruct, influence and impede an official proceeding - that is, a
14 formal SEC investigation, a proceeding before a court of the United
15 States, and a proceeding before a Federal grand jury - by causing
16 another person to falsely state to a representative of Law Firm #1
17 that: (1) CC-1 got BING WANG to sign off on transfers from the
18 Unicorn Account; (2) because of some difficulty with transferring
19 funds from the Unicorn Account to BING WANG in China, BING WANG
20 transferred funds from the Unicorn Account to Employee A; (3) JING
21 WANG did not know about the purchase of Atheros stock in the
22 Unicorn Account at the time of the transaction; (4) CC-1 did not
23 give JING WANG any reports about the Unicorn Account; (5) JING WANG
24 did not know if CC-1 had bought or sold Qualcomm stock in the
25 Unicorn Account; and (6) after 2008, JING WANG did not know what
26 stocks were traded in the Unicorn Account.

27 All in violation of Title 18, United States Code,
28 Sections 1512(c)(2) and 2.

Counts 9-11 (Money Laundering)

(18 U.S.C. § 1956)

64. The introductory allegations contained in paragraphs 1 through 37 of this Indictment are realleged as if fully set forth herein.

65. On or about the dates set forth below, within the Southern District of California and elsewhere, defendant JING WANG did knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, described in more detail below, which involved the proceeds of a specified unlawful activity - that is, securities fraud through insider trading - knowing that the transaction was designed in whole and in part to conceal and disguise the nature, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity:

| Count | Date | Financial Transaction | Amount |
|-------|------|----------------------|--------|
| 9 | 02/23/2012 | Transfer from Unicorn Account XXXX7A66 to Clearview Account XXXX2A09 | $200,000 |
| 10 | 02/28/2012 | Transfer from Unicorn Account XXXX7A66 to Clearview Account XXXX2A09 | $200,000 |
| 11 | 03/05/2012 | Transfer from Unicorn Account XXXX7A66 to Clearview Account XXXX2A09 | $125,481 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

//

//

//

24

## Count 12 - Aggravated Identity Theft

### (18 U.S.C. § 1028A)

66. The introductory allegations contained in paragraphs 1 through 37 of this Indictment are realleged as if fully set forth herein.

67. On or about October 31, 2010, within the Southern District of California and elsewhere, during and in relation to a felony violation of Title 18, United States Code, Section 1001 (False Statements), and a felony violation of Title 18, United States Code, Section 1348 (Securities Fraud), defendant JING WANG knowingly used, without lawful authority, a means of identification of another person, to wit, the signature of BING WANG.

All in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

## Count 13 - Aggravated Identity Theft

### (18 U.S.C. § 1028A)

68. The introductory allegations contained in paragraphs 1 through 37 of this Indictment are realleged as if fully set forth herein.

69. On or about February 22, 2012, within the Southern District of California and elsewhere, during and in relation to a felony violation of Title 18, United States Code, Section 1001 (False Statements), defendant JING WANG knowingly used, without lawful authority, a means of identification of another person, to wit, the identification documents and signature of S.Z.

All in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

//

1

FORFEITURE ALLEGATIONS

2    70.  The introductory allegations contained in paragraphs 1
3  through 37 of the Indictment are realleged as if fully set for the
4  herein.

5    71. Pursuant to Title 18, United States Code,
6  Section 982(a)(1), upon conviction of an offense in violation of
7  Title 18, United States Code, Section 1956, as set forth in
8  Counts 9 through 11 of this Indictment, the defendant, JING WANG,
9  shall forfeit to the United States of America any property, real or
10  personal, involved in such offenses, and any property traceable to
11  such property. The property to be forfeited includes, but is not
12  limited to, the following:

13    a.  $529,069.72 previously held by Merrill Lynch in
14    Account Number xxx02A09, in the name of Clearview Resources,
15    Ltd.

16    72. Pursuant to Title 18, United States Code,
17  Section 981(a)(1)(C) and Title 28, United States Code,
18  Section 2461(c), upon conviction of the offenses in violation of
19  Title 15, United States Code, Sections 78j(b) and 78ff, as set
20  forth in Counts 1 through 3 of this Indictment, defendant JING WANG
21  shall forfeit to the United States of America, any property, real
22  or personal, which constitutes or is derived from proceeds
23  traceable to the offenses. The property to be forfeited includes,
24  but is not limited to, the following:

25    a.  Proceeds of $244,167.

26    73.  If any of the property described above, as a result of
27  any act or omission of the defendant:

28

a.   cannot  be  located  upon  the  exercise  of  due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has  been  placed  beyond  the  jurisdiction  of  the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section  982(b)(1)  and  Title  28,  United  States  Code, Section 2461(c), up to the full amount of forfeitable property described above.

All Pursuant to Title 18, United States Code, Sections 982(a)(1), 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

DATED:  September 20, 2013.

A TRUE BILL:

Foreperson

LAURA E. DUFFY
United States Attorney

By: _____
ERIC BESTE
JOHN N. PARMLEY
TIMOTHY C. PERRY
Assistant U.S. Attorneys

JEFFREY H. KNOX
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By: _____
JAMES P. McDONALD
Trial Attorney
Special Asst. U.S. Attorney