```
 1                  UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   UNITED STATES OF AMERICA,        )
                                      )
 4        Plaintiff,                  ) No. 13-CR-3487-WQH
                                      )
 5           v.                       ) February 20, 2015
                                      )
 6   JING YANG,                       ) 9:35 a.m.
                                      )
 7        Defendant.                  ) San Diego, California
     _____)
 8

 9              TRANSCRIPT OF RESTITUTION HEARING
              BEFORE THE HONORABLE WILLIAM Q. HAYES
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiff:       ERIC JON BESTE, ESQ.
                              JAMES P. MCDONALD, ESQ.
13                            JOHN N. PARMLEY, ESQ.
                              US Attorneys Office
14                            Southern District of California
                              880 Front Street, Room 6293
15                            San Diego, CA 92101

16   For the Defendant:       BRIAN HENNIGAN, ESQ.
                              XINLIN LI, ESQ.
17                            Hueston Hennigan LLP
                              523 West Sixth Street, Suite 400
18                            Los Angeles, CA 90014

19                            JOHN J. RICE, ESQ.
                              Ballard Spahr LLP
20                            655 West Broadway, Suite 1600
                              San Diego, CA 92101

21

22   Court Reporter:          Melinda S. Setterman, RPR, CRR
                              District Court Clerk's Office
23                            333 West Broadway, Suite 420
                              San Diego, California, 92101
24                            melinda_setterman@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

```
 1        SAN DIEGO, CALIFORNIA, FEBRUARY 20, 2015, 9:35 A.M.

 2                            *  *  *  *

 3        THE CLERK:   Number One on calendar, case 13-CR-3487,

 4   United States of America vs Jing Wang, on for restitution

 5   hearing.

 6        MR. BESTE:   Good morning, Your Honor.   Eric Beste on

 7   behalf of the United States, along with James McDonald and John

 8   Parmley.

 9        MR. PARMLEY:   Good morning.

10        THE COURT:   Good morning.

11        MR. HENNIGAN:   Good morning, Your Honor.   Brian

12   Hennigan with Xinlin Li from my firm, and John Rice is with us

13   at the table, and Jing Wang is in court.

14        THE COURT:   Good morning.   Counsel, let's start with

15   the -- we're here for defendant Wang's objections to the

16   presentence report.   Let's start with the objections to the

17   factual allegations.   And you made some objections to -- this

18   is in Document 66 that was filed on 11/24/14.   There are

19   objections to the factual allegations contained in paragraph

20   10, 11, and 28.

21        And let me just tell you tentatively what I think

22   about the objections.   I certainly understand why they are made

23   and that there is certainly portions of those paragraphs that

24   defendant Wang disagrees with or thinks that they should be

25   slightly changed.   From my perspective, I don't see a
```

1    significant disagreement between what the Probation Department

2    has set forth and what the defendants are requesting.  I mean,

3    I understand why they would like them modified.  I do think

4    that there is sufficient evidence in the record to support the

09:37    5    paragraphs that are objected to.

6         To the extent that the defendant, defendant Wang, is

7    concerned that the facts used to impose the sentence are going

8    to be different or inconsistent with the facts that are set

9    forth in the plea agreement, that wouldn't be the case.  I

09:37   10    mean, in all these cases, when I look at the particular facts

11    of the crime, I look to the factual basis of the plea

12    agreement, because that is what the defendant has admitted to

13    under oath.

14         And so it is not uncommon in a multi-defendant case,

09:38   15    and we may have cases with 15, 20 or more defendants, the

16    presentence report is a general summary, and what the

17    defendants admit to in the factual basis, there is no debate

18    that that is what occurred.  And so what I am inclined to do is

19    to deny the objections -- factual objections to paragraphs 10,

09:38   20    11, and 28, but also rely on the factual basis to the plea in

21    determining exactly what the facts are in imposing a sentence.

22         Now, with that tentative ruling in mind, are you

23    requesting a hearing, or is that -- any factual hearing, or is

24    that sufficient for those objections?

09:38   25         MR. HENNIGAN:  That is sufficient for those

1    objections, Your Honor.

2            THE COURT:  All right.  And does the Government wish

3    to be heard?  I am going to overrule the objections.

4            MR. BESTE:  No, Your Honor.

09:39    5            THE COURT:  All right.  Now, let's talk to the -- the

6    next objection objects to the amount of the gains.  That is

7    paragraphs 17, 21, 23, 26, and 29.  Do you wish to be heard on

8    that Mr. Hennigan?

9            MR. HENNIGAN:  I don't think so, Your Honor.  We kind

09:39    10    of set forth in some detail the objection, and I think we also

11    made the point that there is a parallel action with the SEC.

12    They are obviously the body that is empowered and directed to

13    enforce the insider trading statutes, SEC statutes, and they

14    came back and after some prolonged discussion with them they

09:39    15    said this is how this is calculated in terms of amount of gain

16    and amount of loss is always going to be calculated on this

17    basis after the market gets the information, how it reacts.  We

18    reached the agreement of 160,000.

19            I would say this, Your Honor, the only reason we make

09:40    20    the objection and why it matters here is the sentencing

21    Guidelines --

22            THE COURT:  I understand.

23            MR. HENNIGAN:  -- a two-point spread with this, and it

24    looks fairly clear, you know, from the current law on this

09:40    25    certainly looks from the SEC that the $160,000 is the correct

1    number.

2         THE COURT:  Although, in the primary cases that you

3    cite, Nacchio, and the case out of New York, Rajaratnam -- I am

4    mispronouncing the name, but it is the New York case.

09:40    5         MR. HENNIGAN:  Everyone calls them Raj.

6         THE COURT:  I'll say that, Raj.  In both of those

7    cases, it is clear that the defense in those cases had an

8    expert.  In Nacchio it looks like it is Professor Fishell, and

9    then in the Raj case there is a Dr. Gerrall, and they go into

09:40    10    some detail about, in essence, the study, the regression

11    analysis.  It seems like it was a fairly amount of

12    sophisticated analysis to isolate the impact that the inside

13    information had on the price of the stock, as opposed to all

14    the other factors.

09:41    15         And so in this case -- and I understand why that is

16    not done.  But in this case it is really just what the

17    analysis, as I understand it is, assume that the market

18    absorbed all of the inside information the day it was

19    disclosed, and, you know, the analysis of Nacchio and Raj that

09:41    20    you are asking me to follow, those courts had -- I don't think

21    it was disputed that they were able to isolate the impact of

22    the inside information.

23         MR. HENNIGAN:  Here is the difference, in our case

24    we -- we just picked that date because that seemed to be the

09:41    25    date, one, it made sense, that is when the information came to

1  the market, but there wasn't a price movement for the next two

2  weeks to three weeks anyway.  So I think you can go out a month

3  and it is still going to be the under 200,000 number.

4            And then when I looked at -- I went on Yahoo, and I

09:42  5  looked at the price, and that is my level of sophistication

6  when it comes to stock prices.  But one of the things that

7  happened was the price starts going down in May, June.  And if

8  we took those numbers, I think the amount of the gain would

9  have been somewhere closer to 140, 120,000, and then it goes

09:42  10  back up.

11            And it is really inconceivable that he would have said

12  at the time he bought the stock if March 1st, I am going to

13  hold onto it and I am going to get this gain even though it is

14  going to go down substantially in April, May, and June, but

09:42  15  then when I sell it in December at the end of the year, so it

16  was just the question of what was the benefit of the inside

17  information.

18            And certainly within the first week or two weeks it

19  doesn't get above the $200,000 number.  We can go -- I might

09:42  20  have -- I think we might have attached the Yahoo printout on

21  the prices for that timeframe.  But whether it is the week, the

22  day, the month, two months, you really -- two or three months

23  into it, it goes down, so if you use that type of analysis it

24  really -- it is going to wind up being the market absorbs all

09:43  25  the information.

1           And after it absorbs the information, the stock price

2     goes down further, and I think almost any which way you cut it

3     on the timing of this, it turns out to be -- the number is

4     under the $200,000 number.

09:43  5           THE COURT:  And part of the analysis for the -- to use

6     the method that you suggest is that -- it seems that the

7     argument is, anyway -- that the crime is trading on inside

8     information, and after the inside information is absorbed by

9     the market, then the person who traded on the inside

09:43  10    information, they are like any other investor; they have the

11    stock; and when they sell, it shouldn't really impact to a

12    great degree what the Guidelines are because they are just

13    acting like any other investor.

14          MR. HENNIGAN:  That's correct.

09:44  15          THE COURT:  And although in this case -- and I think

16    it is set forth in the plea agreement that your client is

17    really not like any other investor.  The stock was bought and

18    it was kept in this account, and the broker was purportedly

19    advised to sell the stock because the -- your client intended

09:44  20    to commit yet another crime.  It was basically sell the stock,

21    and what appears to have prompted the sale of the stock was

22    inside information on the purchase of another company, and so

23    that same money was used -- or that -- those funds were used to

24    purchase another stock on inside information, and that -- then

09:44  25    that stock was sold to buy other stock on inside information.

1    MR. HENNIGAN:  I think that, you know, that is --

2    could be correct, but that additional gain from the second

3    sale, actually captures all of the gain -- captures all the

4    gain from Atheros sale.  And he is somebody who is on --

09:44  5    internally within the control group and a person with Qualcomm

6    who has the information, but he has the inside position.

7         And with that inside position he would have -- if this

8    is all to be believed that someone could predict the stock

9    market, he would have known that in June and July the stock was

09:45  10   going to plummet, so there is really no claim or really no

11   basis for a claim that the decision to hold onto the stock was

12   based on some understanding of the long-term growth of the

13   Qualcomm stock.

14        The decision to buy the stock was based on, as

09:45  15   Mr. Wang fully admits, we have a board meeting; we know we're

16   going to have this information that is going to go to the

17   market -- it is fairly small increase, I think it is like a

18   two, three percent increase in the market, but he realizes an

19   increase from that; then he holds onto the stock, and he

09:45  20   doesn't make the decision to sell it then.

21        Although, at this point within a week or so, Qualcomm

22   has announced -- on that date Qualcomm announces this is what

23   the dividend is going to be.  The market has all that

24   information.  It assumes all that information on a

09:46  25   forward-going basis, and he is holding onto the stock not

1   selling it.  I think in part because his basically fallback

2   position on everything was to hold onto Qualcomm stock, and he

3   has in his personal accounts a lot of Qualcomm stock that he's

4   just held onto since he started with the company, and it just

09:46   5   stayed there.

6       So it is not a function of he is holding onto it

7   thinking he is going to get a bump later.  It is a function of

8   I bought it at this amount; now the market has all the

9   information; I am not holding it thinking there is something

09:46   10   additional; and if he were naive enough to think that, he would

11   have been disabused by the market because within a month or two

12   or three, the stock goes down like $10 a share.

13       You know, Your Honor, I actually thought we were only

14   talking about the restitution today not the sentencing factors,

09:46   15   which is why I am not totally so crisp on some of the details.

16   Maybe I was mistaken.  I thought it was only the restitution

17   issue.

18       THE COURT:  Really the issues dealt with the

19   objections to the presentence report.

09:47   20       MR. HENNIGAN:  Right.

21       THE COURT:  But to the extent that -- and so my

22   understanding, there were objections both -- the real objection

23   is to the loss amount, and then the restitution -- there is two

24   really big issues today, I think.  One was restitution issue,

09:47   25   which I assume we were to discuss, and then the other one was

1        this losses -- the loss issue.

2                MR. HENNIGAN:  And I am happy -- you know, I did write

3        it.  I did look at it.  I did research the law three or

4        four months ago.  In terms of getting ready for the hearing, I

09:47   5        was focused on restitution.  I didn't realize we were going to

6        be talking about this additional -- the amount of loss for the

7        presentence report.

8                I thought we were probably handling that at the time

9        of the sentencing.  I learned a long time ago that you are the

09:47   10       judge, and if you want to talk about it, I am happy to talk

11       about it.

12               THE COURT:  What I would like to do is -- I guess I

13       would like to give a ruling on the loss amount so that when we

14       get to the sentence that people understand or people know in

09:48   15       advance this is likely the way the Guidelines are going to come

16       out, so people can really tailor their argument.

17               Why don't I do this, why don't I -- on the loss

18       amount, I can hear -- well, the Government -- I can hear from

19       the Government on the loss amount.  I'll give you another

09:48   20       opportunity to respond, and then if you feel, look, I wasn't

21       expecting this argument; I want another opportunity before you

22       -- before you make a final ruling on this, on this issue, I'll

23       give you another opportunity.

24               MR. HENNIGAN:  Thank you.

09:48   25               THE COURT:  That's fine.

1          From the Government.

2          MR. BESTE:  Thank you, Your Honor.  It was my

3   understanding that we were going to talk about both issues, so

4   I am prepared to answer any questions.

09:48    5          THE COURT:  Here is a question, Are there any cases,

6   Court of Appeals cases or District Court cases, that have --

7   follow the Mooney case that have cited it, other than to

8   criticize it?

9          MR. BESTE:  I do not know of a reported decision,

09:49   10   other than the Bhagat case, which we cited in our papers in a

11   footnote, which is in the Ninth Circuit which I don't think

12   cites Mooney, but it -- it basically tracks that that is what

13   the District Court used in calculating the gain; this was the

14   analysis; and the issue wasn't squarely presented to the Court

09:49   15   of Appeals as right or wrong.

16          THE COURT:  Right.

17          MR. BESTE:  But the implicitly acknowledged, that is

18   what the District Court used, so that is what was applied in

19   this case, and there was no questioning by the Ninth Circuit;

09:49   20   nobody reached out to that and said this doesn't make any

21   sense, but I am not aware of any reported decision citing it.

22          And I don't think it is fair -- I would not agree with

23   the characterization that every District Court that has cited

24   it has criticized it.  Simply, though, they say in the facts of

09:49   25   their case they were going to apply a slightly different

1    analysis.  I think Your Honor's question before was right on,

2    that this is a factually different case from the Nacchio case,

3    as well as the Rajaratnam case out of New York, that this

4    defendant was an insider.

09:50  5         Those defendants were alleged to have, in the

6    Rajaratnam case, he was a "downstream to be," so the question

7    of whether it was fair or not or whether the Guidelines should

8    or should not be applied to capture all of the gain that he

9    reaped from the insider trading, that is the analysis that the

09:50  10   Southern District of New York applied in one District Court

11   case.

12        In Nacchio he was an insider, but the way he was

13   trading on the insider information was he was lying in the

14   financial reports of the company, knew that they were false,

09:50  15   and then sold his own stock.  It wasn't like an inside trade,

16   like we have here, that he is trading ahead of news that he

17   knows is coming out.

18        So we would -- we would agree with this Court's -- to

19   the extent that the Court adopted the characterization that

09:50  20   this is a different kind of case; this is factually different;

21   and the only reported decision that really fits is Mooney.

22        It is an Eighth Circuit en banc eleven to two

23   decision.  It was an insider who knew about an acquisition,

24   bought the stock in advance, held onto it for a period of time

09:51  25   even after the acquisition, and actually gained a significant

1    amount of money.  And the straightforward plain language

2    application of the Guideline is what was applied.

3           And we would submit, Your Honor, that in this case

4    where the Guideline is clear, the application note is clear,

09:51  5    and there is no contradictory language in there --

6           THE COURT:  Although, I wouldn't say the Guideline is

7    clear.  It has been interpreted differently.  The words say

8    what they are, but they have been interpreted very differently.

9           MR. BESTE:  And obviously we have to acknowledge the

09:51  10    Nacchio case, and we would submit to Your Honor that it was

11    wrongly decided, but if we were in the Tenth Circuit and we had

12    a fact pattern like that we would have to live with it.

13           THE COURT:  Although there are a number of Second

14    Circuit cases as well.

09:52  15           MR. BESTE:  I would submit, Your Honor, that the

16    District Court cases in the Southern District of New York apply

17    it in a -- again, in a "downstream to be" context, slightly

18    differently.  If the question is, How much did this defendant

19    gain?  That is the question.  There is no dispute.  He gained

09:52  20    over $240,000.

21           It is only if one asks a different question.  What he

22    potentially gained, what did he theoretically gain from the

23    unlawful activity?  If a different question is asked, then the

24    defendant is right, and it is 140,000.

09:52  25           If the question the Guideline asks how much did he

1  gain, there is no -- there is no evidence to dispute that he

2  gained over $240,000.

3         THE COURT:  Does it make a great deal of sense if the

4  SEC comes to one formulation and this Court comes to another?

09:52  5  Is there an explanation for that?

6         MR. BESTE:  Yes, Your Honor, that the SEC -- first

7  off, their area of expertise and their area of regulation deals

8  with the regulation of the securities markets in general and

9  their analysis of what should be disgorgement.  That is about a

09:53  10  they're talking about in this case, the disgoragable figure,

11  similar like a forfeiture analysis in the criminal law context,

12  is based on this complicated market absorption theory.

13         That is not typically what happens in a criminal case.

14  The Guidelines and the Sentencing Commission have set out a

09:53  15  sort of -- let me step back.  The Guidelines try to avoid a

16  very complicated, rigorous, fact-intensive, multifactor

17  analysis on what should be the Guideline calculation for this

18  particular defendant.

19         And there are many places in the Guidelines where it

09:53  20  makes clear this Court does not need to decide down to

21  certainly down to the penny how much damage or harm has been

22  caused, that is, a reasonable estimate based on readily

23  obtainable facts, and if there is a dispute of the facts, we

24  have a hearing, but we typically don't have expert reports

09:54  25  calculating theoretical possibilities on what may or may not

1    have happened.

2         And that makes sense because in the criminal context

3    certainty and clarity is valued more and is an important way in

4    which this Court can discharge its responsibilities because you

09:54    5    always have the fallback of 3553(a) to fashion the appropriate

6    sentence.

7         THE COURT:  Although, the Court in the Raj case did

8    rely on expert reports with respect to the loss.

9         MR. BESTE:  And that is correct, Your Honor, and the

09:54   10    Nacchio case as well as you pointed out.  And I would submit,

11    Your Honor, the Government would believe that that is not what

12    the Guideline -- this Guideline calls for, because there are

13    other Guidelines that the defense points out, 2B1.1, that in

14    certain cases, like the Nacchio case, market absorption

09:54   15    approaches that is talked about, this Guideline, 2B1.4, does

16    not say that.  It doesn't say you should use this analysis.

17         In fact, the absence of such a discussion in 2B1.4,

18    Your Honor, is very loud and clear we think in telling the

19    Court's the Commission's view that it is not appropriate to

09:55   20    conduct a complicated regression analysis on when the market

21    absorbed the information.  Instead, you use a test which is,

22    What did the defendant gain?

23         And I would submit, Your Honor, if you look in other

24    contexts in the criminal law, that is a -- this is not new.  I

09:55   25    mean, if a defendant smuggles narcotics into the United States,

1     there is a presumption, and the Guidelines typically apply such

2     that the amount of narcotics in the car is what the defendant

3     is held responsible for, and that is what -- that is how the

4     Guidelines are calculated.

09:55   5         And we don't go into an analysis of what he thought he

6     may have thought could have been the amount of narcotics.  Now,

7     there are cases that talk about departures and variances and --

8     that could apply.

9         If we had a different case here where the defendant

09:56   10    made $20 million but yet the facts indicated he had no idea he

11    could possibly make that much, then we would be in a different

12    fact pattern, but that is not what is going on here, Your

13    Honor.  He put all of the money in that account into these

14    three insider trades.

09:56   15        There is no evidence that he tried to limit the

16    exposure, to make it a -- to limit his gain, to limit the

17    amount of the crime.  He put everything he could into each of

18    these three trades and made as much money as he could in these

19    three trades, and continually held the funds -- continually

09:56   20    held the stock for an extended period of time.

21        And, I guess, Your Honor, I know am repeating myself

22    what is in the papers.  The last point I will emphasize I think

23    as Your Honor pointed out, he is in a different position than

24    some of these other defendants in these other cases.  And in

09:56   25    one way that is very significant is that while he was holding

1    Qualcomm stock, he was required to report that to the SEC and

2    to his employer and to the public.  And the public is entitled

3    to know if he is holding Qualcomm stock.

4         Every day that he had stock in this Unicorn account,

09:57    5    he was holding it unlawfully, and his continuing possession of

6    Qualcomm stock in the secret account while not following the

7    law, we submit, Your Honor, makes this a case that is readily

8    within the Guideline using just a straightforward gain

9    calculation.

09:57   10         THE COURT:  All right.  Thank you.

11         MR. BESTE:  Thank you, Your Honor.

12         THE COURT:  I'll give you a chance to respond.  Before

13    I make a final ruling, I'll give you a final opportunity to

14    address the Court if you would like.

09:57   15         MR. HENNIGAN:  I would, Your Honor.

16         First, your question, Is there a reason why the SEC

17    does it differently?  And the answer is no.  In fact, there is

18    a reason why Nacchio basically said we do the way the SEC has

19    done it.  What we heard back from the prosecutor on this was,

09:57   20    well, that leads itself in some sort of fairly difficult

21    regression-type analysis.

22         Actually, there was a number of SEC cases that say you

23    take it from the day the market information goes public and the

24    closing price that day.  It is much simpler doing it that way

09:58   25    than doing it the way the Government is suggesting, and I'll

1    tell you why.  If you look at the price of what the closing was

2    for all of the stock, from the Qualcomm stock from the

3    March 1st acquisition date through the first week of December,

4    that would have the impact of saying the amount of gain in the

09:58   5    sentencing implications should ride up and down with regard to

6    every day's variation in the stock.

7         It winds up being that there is a good chunk of time

8    through mid-May through mid-July where if he sold the stock, he

9    would have taken a loss.  It could not be the case.  If that

09:58   10   would happen, that the Government would be in court saying,

11   look, there was no gain; it was insider trade but there was

12   absolutely no gain because he sold it for a loss.

13        If you go day-to-day and change it day-to-day with the

14   closing of the market, you'll run in the anomalies.  If you go

09:59   15   with the Nacchio approach, the approach that has been adopted

16   by the Southern District of New York and dealing with these

17   cases for a long period of time, if you go with the SEC

18   approach, it is a fairly simple -- it hits the market this day,

19   this is what the closing is -- that is the SEC v Patel case

09:59   20   which we cited, a Second Circuit case, saying that is sort of a

21   simple way to go about doing this.

22        The last point, the Sentencing Guidelines don't talk

23   about the amount of gain in the abstract because it is not the

24   amount of gain from the buying and selling of the stock.  It is

09:59   25   the amount of gain as a result of the illegal activity.  And

1  the illegal activity here was charged ss being trading on

2  Qualcomm stock on March 1 with the basis of having inside

3  information.  That is the illegal activity.

4       And the gain if came out as a result of that was by

09:59  5  the time -- that is the inside information.  Once the inside

6  information is no longer inside, proprietary, that is known by

7  the market, it is no longer inside information.  He's realized

8  that gain.

9       And that is what the SEC says.  That is what Nacchio

10:00  10  says.  That is what the much decided dissent in the Mooney case

11  says.  That is what the courts in the Southern District say.  I

12  think that is pretty much lined up that this is the proper way

13  to make the determination with the amount of gain.

14       Last point, when he does sell the stock and there is a

10:00  15  question -- well, he rolls that stock into the Atheros stock

16  and he buys and then sells that, that is all factored into the

17  amount of gain from the Atheros stock from the purchase and

18  sale of that as well.  So it isn't a function of, gee, we're

19  not accounting for this money.  It is a function of based on

10:00  20  his illegal activity, the inside trades, this is what the

21  number should be, and it should be 164,000 or somewhere in that

22  neighborhood, and I would submit.

23       THE COURT:  I'll give you a final opportunity after

24  you've had a chance to review materials, at a future date if

10:01  25  you like, before I make a final ruling.

1          What I would say it is an interesting argument, and

2     both sides have I think very good arguments.  With respect to

3     the -- do you see a difference, though, with respect to the

4     SEC, that when the SEC does something, the reality in the SEC,

10:01   5     I mean, is it fair to say, their concern with disgorgement,

6     which is more remedial; their actions aren't really intended to

7     be punitive; it is discouragement, which is a little different

8     than the criminal context?  Is that a fair distinction or not?

9          MR. HENNIGAN:  To a certain extent, but the

10:01  10     disgorgement is that you disgorged your gain from the purchase,

11     so it really isn't disgorgement in the abstract.  It is a

12     disgorgement of what your gain was from the inside trade.  And

13     to determine that what that is, the SEC says here is the proper

14     way to go about doing that.  What was the stock selling for

10:01  15     when the market didn't know what you knew?  And then later when

16     the market knows, how much did it go up?  That is your gain,

17     and that is what you have to discourage.

18          And I think the SEC says that is way to do it, and

19     frankly, that is what we're suggesting to the Court that is the

10:02  20     proper calculation.

21          THE COURT:  I appreciate the argument.  I think it is

22     in -- maybe it is in the dissent in Mooney or Nacchio and a lot

23     of courts that have followed your suggested method discuss it,

24     and they give the hypothetical, you know, there are three

10:02  25     people; they all trade on the inside information on the same

 1   day, and somebody sells it, makes a lot of money; somebody

 2   makes no money; and somebody loses money, and they say the

 3   Guidelines shouldn't be the same because -- you know, the

 4   Guidelines shouldn't be different because they all committed

 5   the crime on the same day with the same information, which has,

 6   you know, a fair amount of appeal.

 7         But is there a distinction in this case -- and in

 8   those examples somebody -- they committed the crime, and then

 9   what they did with the stock is up to them, you know; they

10   trade on inside information.  Theoretically they get a benefit,

11   and how long they hold it is just up to -- it is sort of their

12   decision when they sell; some people sell and made money, some

13   people sell and lost money; that is the way it goes; your

14   Guidelines shouldn't be affected by some independent

15   investigation you made subsequent to the completion of the

16   criminal act.

17         In this case, as the Government points out in the

18   papers, and, you know, it is clearly in the plea agreement,

19   that the motivation to sell -- there was inside trading, and

20   the motivation to sell was based upon, I think -- I may want to

21   buy this other stock, and so sell, hold the proceeds, and then

22   I am going to tell you when to buy.

23         And so it really was -- the decision to sell was not

24   based upon sort of an independent market for us.  The decision

25   to sell was the motivation to commit another offense, and then

1    the decision to sell was made; then another offense was

2    committed; and then that stock was held; and then the, you

3    know, then it was sold again.

4         And in some of these scenarios, they -- where the

10:04    5    process is used, as you suggest, is that they say, look, after

6    the illegal trading, it is really just -- he is just like any

7    other investor and why should it be treated differently?

8         Is there a distinction, as the Government points out

9    in this case, that there is really -- from beginning to end,

10:04   10    you really can't look at any time on the timeline to say, well,

11    here was legal, there really was no legal activity between the

12    purchase of the first stock, the Qualcomm stock, and the sale

13    of the Qualcomm stock at the end?

14         MR. HENNIGAN:  You know, I think there is, and it is

10:04   15    because the crimes charged is the inside trade on March 1.

16    That was -- you had the inside information; you bought the

17    stock then; and then when the market gets the information, that

18    is the illegal profit that you received from it.

19         I am not so much fixated on if he had sold -- and I

10:04   20    know he is sitting there thinking, man, I sure wish I had not

21    done any of this.

22         THE COURT:  Sure.

23         MR. HENNIGAN:  But I can tell you, if he did -- and he

24    does an awful lot of charitable work -- if he sells on

10:05   25    December 1, and says I am going to donate all the shares to

1    some charity and get on with my life, would that have made a

2    difference?  I think, as I am listening to the Government's

3    argument, the answer is no.  They are saying you are an insider

4    through the period, and if you held onto it, it doesn't matter

10:05    5    what you do with the stock later.

6        The fact that he did another insider trade later, that

7    triggers the second inside trade which he has pled guilty to,

8    and that is captured in that calculation as well.

9        If I can go back to the example you gave us kind of

10:05    10    comes up in a number of these cases, I think it was the dissent

11    in the Mooney case where the judge said, look, you have three

12    individuals; if you have -- make just one individual, Jing

13    Wang, he sells a month later and he realizes $8 per share gain;

14    he sells three months later and he realizes essentially a $3

10:06    15    per share loss; he sells eight months after that and then he

16    realizes some other type of gain; it doesn't make sense if the

17    law is saying we're going to determine that amount based on

18    what happens in the market as it fluctuates up and down with

19    regard to any sale.

10:06    20        The crime is trading on inside information.  You had

21    inside information.  You got a bump in the stock based on that

22    insider information, and that bump gets realized -- and it is

23    the Patel case that talks about basically determined on the day

24    after the market gets the information.  That is why, frankly,

10:06    25    when we put together the pleading on this one, I included the

1    Yahoo printout of what the prices were, because it really sort

2    of establishes the point you were just making.  Prices come up,

3    up; and they go down, down; they get to the mid-part of the

4    year; and we wouldn't get here arguing, gee, it should be,

10:06    5    well, he didn't sell yet and the price would vary from minute

6    to minute, day by day; it is basically calculated based on the

7    market gets the information, that is the gain, and I won't

8    repeat the rest.

9            THE COURT:  Thank you.  It is a very interesting

10:07    10    argument, and I'll give you another opportunity before I make a

11    final ruling, if you like.

12            MR. HENNIGAN:  Thank you.

13            MR. BESTE:  Your Honor, is the Court inclined to at

14    least issue a tentative?  I, for one, thought it was a good

10:07    15    suggestion that we come to the sentencing hearing already

16    knowing where we stand on the Guidelines, and I understand the

17    defense wants another opportunity, and your Court is going to

18    give it to him, fine.  It just would be helpful for the

19    Government's perspective if we knew where Your Honor is

10:07    20    standing so we can tailor our arguments.

21            THE COURT:  Based on the restitution we'll have to

22    meet again, so let's address the restitution issues, and then I

23    do think it is going to be -- it is likely that I would issue a

24    ruling before you show up for the actual sentencing, because it

10:07    25    is more helpful to the sides to know that this is -- the

1    objections have been ruled upon; this is what he thinks the

2    Guidelines are; and we can go forward from there.

3         The arguments have been helpful.  It is an interesting

4    issue with respect to the loss, so let's move to the

10:08    5    restitution issues, and as I understand the defense objections

6    that -- is it the case that at the end of the day the defense

7    is saying that there is simply not enough information that has

8    been supplied to warrant an award of attorney fees?

9         MR. HENNIGAN:  That is part of it, Your Honor.  The

10:08    10   legal standards essentially say the Government has the burden

11   of establishing with a preponderance of the evidence that the

12   expenses here were necessary for the investigation or

13   prosecution of the defendant.  And, in fact -- I can go through

14   the rest of this.  It -- one of the things the Government did,

10:08    15   I think it is page ten of their brief, they really threw their

16   hands up and said we don't take any position with regard to the

17   reasonableness of these fees.

18        Some of the courts when they are dealing with these

19   cases -- I am thinking of the Gupta case in the Second Circuit.

10:09    20   They wound up coming with 529 pages of the --

21        THE COURT:  Right, the Sullivan and Cromwell billing

22   records.

23        MR. HENNIGAN:  Right.

24        THE COURT:  And there is another case where they came

10:09    25   in with like 227 pages of billing records.

1          Is it fair at this point that we can't -- in your view

2    you can't really address the categories of the restitution that

3    is being requested because you just don't know enough about

4    purportedly what their attorneys did and how closely it was

10:09   5    related to this -- to the criminal case?

6          MR. HENNIGAN:  And more specifically because we --

7    that is correct.  More specifically, if I can put a finer point

8    on this, in the course of the first thing we get from the

9    Merrill Lynch attorneys is a $7.8 million claim -- 7.5 million.

10:09   10   We say that seems -- there were three inside trades.  That

11   seems a little preposterous.  The next thing we get back, okay,

12   we're now at -- basically the number has been cut in half, and

13   so it is 3.8 million.

14         And we have been told at least at some point by the

10:10   15   Government that we should be aware that we're in sights as well

16   for our activity in connection with these trades or more

17   broadly because there is a reason why it would be more broadly

18   the way the operation was being done in the San Diego office,

19   so they have every reason in the world to come in and do a

10:10   20   thorough examination, an internal review, to find out

21   everything that they could find out, but no indication as to

22   how much of that had anything to do with the Jing Wang, here

23   are my three inside trades, and a lot of indication of it was a

24   lot more far reaching than that.

10:10   25         So there is no connection between the records that

1   we've gotten, and in fact, any of Jing Wang's activities, even

2   his activities in conspiracy with Gary Yin with regard to the

3   Unicorn account.  And I can get into a little bit more detail

4   on that if the Court would like, but I am hoping I am answering

10:11   5   the Court's original question.

6          THE COURT:  For the most part.  I guess before we get

7   there, there is an objection.  You don't spend a great deal of

8   time on it in your papers, but there is an objection suggesting

9   that Merrill Lynch is not a victim.

10:11   10          MR. HENNIGAN:  Correct.

11          THE COURT:  Do you wish to address that?  Is it your

12   first position that as a matter of law they are not a victim

13   and they can't recover any fees because they are not a victim?

14          MR. HENNIGAN:  Yes, Your Honor.

10:11   15          THE COURT:  Do you want to address that now?

16          MR. HENNIGAN:  Right.  When we first get the demand

17   for the $7.5 million, they drop a footnote in there saying,

18   We've been requested by the Government to make a presentation

19   the Government with regard to Merrill Lynch's potential -- I

10:11   20   think it was culpability or liability, and what was interesting

21   about that was it was a request to make that presentation after

22   both Jing Wang and Gary Yin had pled guilty.

23          And I harken to the Waknine case -- Waknine case, and

24   where a party came in and said some portion of what we --

10:12   25   originally what we thought was we potentially were brought in

1    as a defendant and targets of the investigation, and what the

2    Court says in that regard, if you are incurring legal expenses

3    because you are thinking that this is going to be necessary for

4    my own defense, your own defense, it isn't incurring legal

10:12    5    defenses with regard to assisting the Government in their

6    investigation.

7            In that regard you are not a victim.  In that regard

8    you are somebody who is a potential target of the

9    investigation, and when that is the case, hats off to you; go

10:12    10   and conduct all the investigation you like; but it is not going

11   to be billed to somebody else; this is your own problem.

12           THE COURT:  But isn't that the case though -- or is it

13   the case that -- that issue would be if you receive the records

14   with adequate support so that you could see what exactly was

10:13    15   billed.  Then the discussion would be, well, all right, we my

16   be responsible for the fees that were spent, you know,

17   investigating these trades, the investigating to see whether

18   there are other trades that were done, to see whether or not

19   their employee engaged in other trades.

10:13    20           To the extent -- and this would be -- I understand

21   your argument would be that, well, to the extent that you were

22   concerned with your own criminal liability, we're not

23   responsible for those fees, but we're responsible for some fees

24   but not for others.

10:13    25           Is that the argument?  Or I thought -- there was a

1    portion of your brief, I think, that you said we're not -- they

2    are not a victim, period, and they get nothing.  Is that the

3    case?

4           MR. HENNIGAN:  I think that is the case, Your Honor.

10:13   5    When they are -- at the time of the search and the time of the

6    first grand jury -- there were only three grand jury subpoenas.

7           THE COURT:  Right.

8           MR. HENNIGAN:  We're of the understanding that we have

9    exposure here, and we're going to conduct this internal

10:14  10   investigation, and it is going to run to the tune of $3 million

11   or so to do that, and we're going to retain Huron consulting to

12   have a document retention program, it is -- I don't know how

13   you separate we're doing this for purposes of our concern about

14   our exposure, but when the US Attorney's Office is telling me I

10:14  15   would like to hear a presentation from you after the criminal

16   case is done with the other two and we're concerned about your

17   exposure.

18          While this wasn't in the original documents sent out,

19   when I did contact the Wilmer Cutler attorney, Mike Leota, I

10:14  20   make reference to this in my declaration, and he says, yes, we

21   were told that we essentially in the cross hairs, a decision

22   hasn't been made, it explains why there would be the $4 million

23   expense for attorney's fees on investigation and other work

24   done.

10:15  25          That is certainly understandable why Merrill Lynch

1    would -- let's make sure we're protected, but that has to do

2    with protecting Merrill Lynch and not having to do with we're

3    assisting -- we're providing necessary items for the

4    investigation and prosecution of Jing Wang.

10:15    5         THE COURT:  But is that a case, though, that where --

6    the issue there would be what portion of the fees are -- can

7    Merrill Lynch recover, as restitution as opposed to they can't

8    recover any?  I mean -- that is the position that I am asking.

9    Is it the case that -- and I don't think this is a particularly

10:15    10   unusual circumstance where there -- and you reference the Gupta

11   case where there's been, you know, misdeeds by a employee; the

12   company investigates it, and they are certainly concerned with

13   their own conduct; and so the issue is how much of these fees

14   are available for restitution and, you know, how much -- how

10:16    15   much are not.

16         And so is it -- is the issue that we have that you

17   don't have enough information as to what the fees -- what they

18   spent the money on it and what the tasks were and what they

19   specifically related to?  And your concern is some of these

10:16    20   fees we don't think that we have to pay for, but do you agree

21   that you have to pay for some?  Or is it the case that, look,

22   if they did any of this because they were worried about their

23   own conduct, then that ends it, and we don't have to pay a

24   dime?

10:16    25         MR. HENNIGAN:  I would probably elevate it to worrying

1    about your own conduct to being told that we're in the cross

2    hairs of an investigation and the Government would like me to

3    bring -- make a presentation to them after the other two people

4    have already entered their guilty plea, so the only reason that

10:16    5    that presentation would be made is the Government is evaluating

6    the potential criminal charges against Merrill.

7         So it is elevated beyond I have some general hunch

8    that I might have a problem to the Government is making it

9    fairly clear, there are some issues here that we're looking

10:17   10    into.

11        I will say this, Your Honor, we didn't get the grand

12   jury subpoenas from the Government.  We did get them from the

13   Wilmer Cutler people, and one of the big issues in this case

14   had been the creation of these offshore entities by Merrill

10:17   15   independent of anything dealing with Jing Wang.  This was the

16   practice within the Merrill office.

17        When Jing came to open up an account, he approached

18   Gary Yin and the wealth advisor there, and what Gary said was

19   the way we do these things, we have offshore wealth companies,

10:17   20   and we could activate one of these companies if you like, and

21   that could be the owner of the Unicorn account if you like.

22        And that would seem to be a reason for the Government

23   to say this seems pretty -- how many of these offshore entities

24   do you people have?  Who is responsible for these offshore

10:18   25   entities?  And, in fact, when you look at the first grand jury

1    subpoena, there is an awful lot of examination about tell us

2    about your Cayman entities and Virgin Island entities.  The

3    Unicorn was the British Virgin Island.

4         I guess to answer your question, it is elevated not

10:18   5    that I have a hunch but I have been told by the Government I

6    have an issue, and I think that will inform how much time,

7    money, and effort I spend in terms of doing everything in this

8    case, as opposed to, gee, we need your help with regard to

9    investigation of Jing Wang and Gary Yin; there are these three

10:18   10   trades we're looking into; and of the three trades we're

11   looking into, sure, I can provide information; if I don't have

12   exposure, I am doing this a whole lot differently, and the

13   Government has told them that they do have exposure.

14        THE COURT:  Is it, at the end of the day, the position

10:18   15   is Merrill legally would likely be entitled to some fees if

16   they can document and prove by a preponderance of the evidence

17   that they were related to the criminal conduct?  Or is it the

18   case that, well, because they were told that the Government had

19   concerns and they did a lot of this work because they were

10:19   20   concerned about their own culpability that they don't get

21   anything?

22        MR. HENNIGAN:  You know, I am really reluctant to go

23   down -- and I hear what the Court is asking.  Is the second

24   one, you know -- would I prefer that was the case?  Sure.  I

10:19   25   don't think that is the law.

1          THE COURT:  I don't either.

2          MR. HENNIGAN:  And so -- well -- we reached some

3    agreement.

4          THE COURT:  Right.

10:19    5          MR. HENNIGAN:  So where do we divide that in between

6    here's the -- okay, we have three trades; here is the work that

7    was done with regard to ferreting out those trades; we pulled

8    up the Unicorn account documents; and the rest of the work that

9    was done, which looks like -- I think as I calculated this up

10:19   10   about 8,000 hours of work done by the Wilmer Cutler people, and

11   then hiring Huron Consulting to put out a report.

12          Even if I am looking at the billing records, I am not

13   sure if I were looking at billing records how much I would be

14   able to say, oh, that was done because of the Jing Wang

10:20   15   involvement and that was done for something else.

16          But I will say this, what we've been given so far, the

17   half-sheet summary, it just doesn't provide any information,

18   and then what the Government wound up doing was coming in

19   shrugging saying we don't really take a position on this.

10:20   20          THE COURT:  Well, I guess what I -- I think there is

21   an agreement that -- and I certainly want to hear from the

22   Government first -- that there very well may be an issue with

23   respect to there is just not enough support at this point.  So,

24   you know, to have any kind of really in-depth conversation

10:20   25   about what is covered and what is not covered, it is hard to

1   know because you are really operating in the dark.

2            Why I raise the issue in your papers on Document 73,

3   page 8 of 14, it says, Merrill is not a victim under the MVRA.

4   And there is one Ninth Circuit case that was cited.  And the

10:21  5   comment was made that worse if Merrill were found to be liable

6   for Mr. Yin's conduct, Merrill could be a co-conspirator, in

7   which case it cannot recover restitution.

8            The one case that was cited I don't think is really

9   applicable.  In that case, I mean, the person seeking

10:21  10   restitution was -- an information that was filed against them,

11   and they were involved in money laundering conspiracy, so I

12   don't think that -- there is no reason to think that applies,

13   and so I guess what I wanted to get to was, you know, is there

14   an agreement that Merrill is a victim that can recover if they

10:21  15   are able to prove by a preponderance that they have, you know,

16   damages that are recoverable?  And I don't know that we're

17   there yet.

18            I was just trying to see whether or not you were

19   taking a position, hey, as matter of law they are not a victim,

10:22  20   so we don't need to go any further.

21            MR. HENNIGAN:  Frankly, the thrust of my argument was

22   going to be -- this came up in the presentence report

23   mid-October.  We made the objection.  The Court asked for

24   additional briefing on it.  It is four months after this had

10:22  25   come up that you asked for sort of a specific statement with

1   regard to tying these fairly large expenses into this

2   investigation.

3        We're four months later.  We don't have anything that

4   ties any of this together, and in fact -- and I actually

10:22  5   congratulate Mr. Beste on this, the forthrightness of coming in

6   saying we don't take any position with regard to the

7   reasonableness of these fees.  When you get to that spot four

8   months in the sentencing portion, there is another provision of

9   the Victim Witness Protection Act that I think kicks in the

10:22 10   3663(a)(1)(B), the Court may decline to make an order of

11  restitution to the extent the Court determines that the

12  complications in prolongation of the sentencing process

13  resulting in the fashioning the order outweighs the need for

14  restitution.

10:23 15        I don't know if there can be an unwinding and a

16  presentation by Merrill with regard to here's why we're

17  righteously entitled to these expenses, but nothing like that

18  has even been remotely made, and we're four months into this.

19  The only thing that has happened so far is the first demand for

10:23 20   7.5 million has been cut in half to, I think, around 3.8, 3.9

21  million, but there is no tying together, here's what we did,

22  and here how it relates to the Jing Wang investigation.

23        If I can make one last point on this, so I realize it

24  was the Government's burden, but I thought, you know, what I

10:23 25   should do is try to see if I could figure out what it was that

1   was actually done in connection with this work because I

2   figured sooner or later I would be in front of the Court

3   providing some hopefully -- hopefully some insights into this.

4          So we went back to the Wilmer Cutler firm and said you

10:24   5   mention that there were three grand jury subpoenas and a number

6   of informal requests made; can we get copies of those; and you

7   also mention that there were a lot of SEC subpoenas and

8   requests made; could we get copies of those; this is really

9   just so we can confirm does this have something to do with

10:24   10   these trades.

11          So the last grand jury subpoena was served in July of

12   2013.  This is consistent -- this was a case that was

13   essentially done.  The Government was essentially finished with

14   that investigation, and that subpoena had nothing to do with

10:24   15   Unicorn or Jing Wang.  The previous subpoena which was in late

16   March, again, there were two other -- it looks like Chinese

17   names on the subpoena -- had nothing to do with Unicorn or Jing

18   Wang.

19          We don't have the SEC documents.  They've declined to

10:25   20   produce the subpoenas or the request to us.  We made the

21   request.  We renewed the request last week.  We got the stiff

22   arm, we're not going to produce it.  That's fine, but that

23   prevents us from saying here is how that ties in or doesn't tie

24   in with the Jing Wang matter.

10:25   25          And then with regard to the informal request, most of

```
        1   them look like -- and we did get e-mails that contain that.
        2   There were one or two questions.  A lot of those requests had
        3   nothing, again, to do with Unicorn or Jing Wang.  There were
        4   some additional names that were mentioned.  We're looking into
10:25   5   this as well.
        6        So I am left with we're four months into it; we don't
        7   have anything from Merrill Lynch that looks like here are the
        8   expenses necessary with regard to the investigation and
        9   prosecution.  The burden is the Government to do this, and
10:26  10   again, forthrightly, they stepped forward and said we don't
       11   take a position on it.  There is no declaration from the
       12   Government that this was necessary for this investigation.
       13        And one last point --
       14        THE COURT:  Although, excuse me for interrupting, but
10:26  15   even if they had a declaration as well as what Mr. Beste said;
       16   I talked to them; I believe them; here is my declaration; and
       17   this was all necessary, your position wouldn't be any different
       18   today, would it?  You wouldn't be saying, all right, well,
       19   Mr. Beste says so, all right, we're okay with it?  I don't
10:26  20   think that would happen, would it?
       21        MR. HENNIGAN:  I like Eric a lot, but I don't like him
       22   that much.  No, it wouldn't be --
       23        THE COURT:  All right.
       24        MR. HENNIGAN:  -- because that wouldn't be the kind of
10:26  25   things they would have to say in the declaration form.  In
```

1    fact, what courts have said is not sufficient is kind of as

2    lukewarm as the Government has gotten on this.

3              THE COURT:  Right.

4              MR. HENNIGAN:  It is not enough.  The Cuti case that

10:26    5    says basically to say that they gave us assistance, that isn't

6    enough; it doesn't meet the standard.

7              THE COURT:  Is it the case then that if I agree with

8    you that it is not enough, is it the case then that -- and I'll

9    hear from Mr. Beste -- is to tell the Government, well, this

10:27   10    isn't enough, and here are some other cases where these issues

11    were raised, and this is what they did in the other cases, so

12    if you want to pursue this, this is what you have to do?

13              Or is it the case that you are saying -- you are

14    telling them you had your chance; it is too late; victim gets

10:27   15    nothing, and it is too complicated, no restitution?  Is that --

16    that is the way I understood the last argument to be.

17              MR. HENNIGAN:  Right.  I think that you -- that is --

18    that is up to the Court, of course.

19              THE COURT:  I am not inclined to do that.

10:27   20              MR. HENNIGAN:  Well, if I could pull you back to why

21    that is a really good idea.

22              THE COURT:  Okay.

23              MR. HENNIGAN:  We're four months into this.

24              THE COURT:  We are.  And I am not wildly enthused by

10:27   25    the delay.  It has been caused by a lot of factors.

```
 1              And so I am not -- to the extent -- I am not inclined
 2     to tell the victim, as I would in any case -- in some of these
 3     cases I had, they are not the same as this case, but I have had
 4     cases, you know, in some of these, like a child porn case, for
 5     example, where literally the Government has gotten a letter
 6     from the victim the night before the sentencing, and they come
 7     in and say we contacted these victims; we got contacted last
 8     night at 8:00; and now they want to put in a declaration or
 9     they want to do something; and then I say, all right, well,
10     we're going to have to continue it to give them a chance.
11              And so on the Merrill Lynch -- I understand the
12     argument to say, look, they've had their chance; they are a
13     sophisticated company; they should have known that they had to
14     do more; but I am not inclined to say you get no chance -- no
15     more chance to meet your burden.
16              MR. HENNIGAN:  Let me push that to one more level.
17              THE COURT:  All right.
18              MR. HENNIGAN:  They are not only a sophisticated
19     company with a sophisticated law firm representing them, but
20     they filed the first claim and they made reference to most of
21     the cases we're talking about now, so this isn't -- and I --
22     certainly would be much more solicitous if it is an individual
23     who doesn't know the rules; and, gee, I just heard about this;
24     and let me see if I can get things in correctly.  That isn't
25     this case.
```

1          We're going back to September when the first letter

2     was written, and they are citing all of these cases, and many,

3     in fact, think all the cases we've cited and the Government has

4     cited and talking about the burden and who has the burden,

10:29   5     talking about it has to actually be a necessary expense for the

6     investigation, and they just blew right past it.  They didn't

7     do it.

8          We were going to be in here for restitution sometime I

9     think in November and this Court entered an order saying

10:29  10     look -- I assumed because my reaction would have been it looks

11     like it is a bucket of worms being in front of me; I don't have

12     any idea what is supposed to be recoverable as restitution or

13     not; why don't you address these issues so I have a chance to

14     figure this thing out.

10:29  15          And we did.  The Government basically came in, and it

16     looked like they didn't know what to do, but they didn't get

17     anything else from Merrill Lynch and WilmerHale, and if this is

18     legitimately a $4 million claim, which for the three trades at

19     issue here it seems preposterous on its case, they had all the

10:30  20     reasons to come in here for a very detailed presentation to the

21     Court and make this showing, and they didn't even start trying

22     to do it, really you've given plenty of opportunities to do it,

23     I don't see why we would say at this point it doesn't fit under

24     that statute which actually is directly on point if it is going

10:30  25     to prolong the sentencing and it is too complicated, and here

                1    with extremely sophisticated victim not paying attention to

                2    their obligations --

                3            THE COURT:  I don't know that -- I am not inclined to

                4    say at all it is too complicated.  Other courts have done it,

     10:30      5    so I am not inclined to say that.  I understand the argument

                6    that it is too late; just rule; they haven't met their burden;

                7    even the Government somewhat concedes they haven't met their

                8    burden and just end it now and say no restitution.  I am not

                9    inclined to do that.

     10:31     10            So let me hear from Mr. Beste and then we will -- or

               11    is this Mr. McDonald?

               12            MR. MCDONALD:  McDonald.  Thank you, Your Honor.

               13            THE COURT:  As has been pointed out, not unexpectedly,

               14    you know, the Government says we take no position with respect

     10:31     15    to reasonableness, so I am assuming that you take no position

               16    with the reasonableness because you have no way of knowing.

               17    How do you know, right?

               18            MR. MCDONALD:  With respect to the fees.  If I may for

               19    a moment, if I can set the elephant in the room, the $4 million

     10:31     20    in the cage for a second and proceed to the threshold question

               21    that you identified as to who are the victims.  There is a

               22    representative from Merrill Lynch here today who would like to

               23    make a victim impact allocution about the harms of Merrill

               24    Lynch.

     10:31     25            THE COURT:  I rather do that at the sentencing.

1       MR. MCDONALD:  That is fine.  Although, it goes

2   specifically to the Court's interpretation of what are the

3   harms here, and there is, as I understand it, an explanation of

4   how the fees were incurred, and it details -- it is in the

10:32   5   declaration already, but this will be helpful for the Court

6   hear that, if the Court is so inclined the victim

7   representative is here.

8       THE COURT:  Here is what my tentative is or here is

9   what my concerns are, and then we can address those, is that I

10:32   10   certainly reviewed the information, and it appears -- I don't

11   think that there is a great deal of, you know, dispute in the

12   cases about what is required.

13       And as counsel pointed out, you know, in the Gupta

14   case, which isn't -- I don't know if it is dramatically

10:32   15   different.  In that case they did talk about, you know, in

16   support of the request for restitution Goldman Sachs submitted

17   542 pages of billing records from its counsel, Sullivan and

18   Cromwell.  The billing records include time billed for legal

19   services and advice relating to Gupta's conduct which Goldman

10:32   20   Sachs further describes as involving factfinding regarding

21   Gupta's conduct representing the firm and its directors,

22   officers, and employees in responding to criminal and

23   regulatory enforcement investigation and the resulting

24   prosecution of Gupta and his tipee.

10:33   25       In another footnote it also goes onto talk about that,

1    Moreover, despite their volume Goldman Sachs' time entry

2    specified the work performed with sufficient particularly to

3    address what was done, how it was done, and why it was done.

4    Indeed, after careful review of Goldman Sachs' bills, the Court

10:33    5    has identified a small number of time entries that should be

6    excluded because they relate to post-conviction deposition

7    preparation for civil cases and has also noticed that on a few

8    occasions a number of attorneys staffed on a task while perhaps

9    perfectly appropriate on the assumption that Goldman Sachs

10:33   10    wished to spare no expense on a matter of great importance to

11    it exceeded what was reasonably necessary under the MVRA.

12            And so it would certainly seem in that case they had

13    the billing records in -- even the case that the Government

14    cited saying that you could use an affidavit, I mean, that case

10:34   15    didn't hold that you could hold -- that you could have an

16    affidavit, and specifically held that -- I think it is the

17    Waknine case -- it is unreasonable to expect the defendant to

18    be able to counter evidence provided by the victim concerning

19    attorney fees.

10:34   20            Rather, it is the responsibility of the Government

21    aided by the victim to provide adequate evidence.  A

22    sufficiently detailed affidavit doubtless would suffice in most

23    cases but will remain of the view that what was done here was

24    too conclusory because the District Court did not ensure the

10:34   25    restitution order was supported by sufficient evidence.

1           And that was attorney issues, and so I don't see how

2    the defendants could really separate out what was done -- and I

3    think at the end of the day there is still going to be a debate

4    about the fees and what the fees -- what they can get fees for

10:35   5    and how much of their own concern do they recover and how

6    much -- how directly do the fees have to be related to the

7    criminal conduct.

8           I think there is still going to be a debate, but I

9    don't see how we can have a conversation without the billing

10:35   10   records.

11          MR. MCDONALD:  Your Honor, the information that was

12   identified specifically in Waknine is missing, and I'll quote

13   from the opinion, The loss summaries do not contain itemized

14   lists indicating, for example, the time spent by the attorney,

10:35   15   the activities engaged by the attorney, the attorneys'

16   credentials -- which are now stipulated by Mr. Hennigan's

17   statement -- and the billable rate are right here, and they are

18   in the exhibit.

19          We know how many hours were spent.  We know from the

10:35   20   declaration of Mr. Davis that the expenses were directly

21   related to the requests for information and subpoenas from the

22   Government.  We can calculate the billable rate.  I did the

23   math.  It is $330 an hour.  So the information that Waknine

24   said is missing we have here, and so --

10:36   25          THE COURT:  Let me ask you this then, Is it your

```
 1    position that it is sufficient and I should enter an order for

 2    that amount of restitution?

 3              MR. MCDONALD:  Yes, Your Honor.

 4              THE COURT:  Then why does the Government say we take

 5    no position.

 6              MR. MCDONALD:  We said we take no position with

 7    respect to the billable rate.  So I am in no position, Your

 8    Honor, and I don't think the Government is to comment on the

 9    $332 an hour is and average as to what -- I'm sorry, Your

10    Honor, go ahead.

11              THE COURT:  Well, I guess if it is not good enough for

12    you, why would it be good enough for me?

13              MR. MCDONALD:  Your Honor, we simply do not comment on

14    whether the rate is a reasonable rate.  Based on my review, my

15    understanding of billable rates, in -- by major firms in major

16    cities, $332 an hour seems like a fair rate.  That is simply my

17    speculation on the matter.  The Court is certainly well

18    experienced in what is a appropriate billable rate in a

19    criminal matter whether CJA or otherwise.

20              THE COURT:  Is it the case that -- does the defendant

21    [sic] have to say, look, we did this work; this is the number

22    of hours we worked; this is the amount; this is how we said we

23    spent it; pay it; that is all you get?  Is that the end of the

24    day, is that -- you represent the victim.

25              MR. MCDONALD:  Correct.
```

|           |    |                                                                      |
|-----------|----|----------------------------------------------------------------------|
|           | 1  | THE COURT:  And so the position can be -- but I am not               |
|           | 2  | going to do this in stages, so if the position is, look, this        |
|           | 3  | is what we've given you; what we've given you complies with the      |
|           | 4  | law in the Ninth Circuit; there is a case that says this is          |
| 10:37     | 5  | good enough --                                                       |
|           | 6  | MR. MCDONALD:  Yes, Your Honor.                                      |
|           | 7  | THE COURT:  -- and give it; and we think we met our                 |
|           | 8  | burden, and that is all we're giving you, and so you can enter       |
|           | 9  | the order or not.                                                    |
| 10:37     | 10 | MR. MCDONALD:  Your Honor --                                         |
|           | 11 | THE COURT:  Is that the case?                                        |
|           | 12 | MR. MCDONALD:  No, Your Honor.                                       |
|           | 13 | THE COURT:  Here's what I am not going to do, I am not              |
|           | 14 | going to let somebody come forward and say this is it; we            |
| 10:37     | 15 | satisfied the law; this is everything; as a matter of law you        |
|           | 16 | have what you need, and then if I rule and say -- I am not           |
|           | 17 | telling what you I am going to do, but if I rule and say not         |
|           | 18 | enough, I am not then going to entertain, he wants more, okay,       |
|           | 19 | we'll give you more.  I am not going to do that.                     |
| 10:38     | 20 | And so that is what is the whole purpose of this.                   |
|           | 21 | Let's get the record and then I can make some rulings, but I am      |
|           | 22 | not going to do it in this case or any other case where I say,       |
|           | 23 | all right, here is ruling number one, and then the side that         |
|           | 24 | loses says, all right, he's going to be picky, let's see if we       |
| 10:38     | 25 | can give him more.  I am not going to do that.                       |

1          MR. MCDONALD:  We're not asking you to do that.  We're

2    asking to you rule on the basis of the record that exists and

3    we'll accept that ruling.

4          THE COURT:  You want to --

10:38   5          MR. MCDONALD:  I want to make a record, though, that

6    the victim has an allocution that they want to detail the

7    harms, and in that process as I understand from the information

8    provided by the attorneys for Merrill Lynch, there is an

9    explanation for how the accounting in this circumstance was

10:38  10    done for the expenses, and it relates to billing records and

11    things that the Government doesn't have at their fingerprints.

12    But the victim allocution statement will address those matters

13    and could be help to the Court in at least understanding that

14    process and understanding why 4 million in a sophisticated

10:39  15    financial fraud that involved the British Virgin Islands,

16    China --

17          THE COURT:  I am not arguing about that.  What I want

18    is to be absolutely clear because you represent Merrill Lynch

19    here that if your victim is saying, look, we've given

10:39  20    everything we're going to give and we have somebody here that

21    wants to testify, and that is it; we're not giving anything

22    else; the record is closed after the witness testifies, nothing

23    else; we'll give nothing else; if that is the case and that is

24    what your victim wants to do, we'll do it, but there is no

10:39  25    second -- there is no -- after the ruling, there is not going

1    to be, all right, we'll submit the billing records; we will

2    submit the detailed description saying what was involved; we'll

3    give the records such so that someone can go through and sift

4    out what we did that was specifically related to the crime,

10:40    5    what was related to what we had to do because of our own

6    concerns about our own conduct, also the investigation; we're

7    not -- we're not giving any of those; and if that is the

8    informed judgment that the victim has -- but they should

9    understand this is not a step process.

10:40    10    And that's fine.  If they want to do what this is,

11    but, you know, the other cases -- there is a number of cases, a

12    number of cases, where they've given much more.  There is

13    another case Amato -- and again, this is not the first time

14    this issue has come up, so I assume that Merrill Lynch is well

10:40    15    aware of it, but this is a case that this is United States vs

16    Amato.

17    In dealing with this issue they talked about the

18    attorney fees, and it says, Defendants maintain in addition

19    that other expenses cannot encompass attorney fees and

10:41    20    accounting costs because such expenses amount only to indirect

21    or consequential damages, whereas restitution is limited to

22    direct harm.  To support this assertion, defendants point to a

23    number of cases in other circuits in which the courts have

24    rejected the inclusion of attorney fees in restitution orders

10:41    25    on this basis.

1        MR. MCDONALD:  Your Honor, I would certainly stipulate

2    that in other cases billing records have been presented, but

3    the information at the end of the day even if you take 572

4    pages of billing records or 1,000 pages of billing records you

10:41  5    would create chart that would exactly like this.

6        THE COURT:  Maybe not, though, because the defendants

7    might say they spent 100 hours on this one part.  We shouldn't

8    have to pay for that; they spent 400 hours on something that

9    had nothing to do with this crime; we don't have to pay for

10:42  10    that.

11        I don't know to what extent the defendants want to go

12    through the billing records, but again, it is not for me --

13    this isn't like a discovery process where I have to order

14    anything.  All I do is rule upon what is here.  And the

10:42  15    cases -- I mean, this Amato case says, The memorandum in

16    support of the fees is supported by 228 pages of invoices and

17    other documents detailing the costs involved.  Viewing this

18    evidence as a whole, we see no clear error in the District

19    Court's determination that EDS expended $3,088,466 on its

10:42  20    attorney fees and accounting costs.  I assume the 228 pages

21    were the bills, but if your client -- I am not going to order

22    your client to give the bills.

23        MR. MCDONALD:  Your Honor, I should be clear.  It is

24    not my client.  The Government as an obligation to speak on

10:42  25    behalf of the victims.  We have a victim impact statement from

1     Merrill Lynch.

2          My understanding is from discussions from Merrill

3     Lynch that the billing records would not be of sufficient use

4     and would, as I said, would result in some sort of table like

10:43   5     has been presented to the Court because a number of the matters

6     that are in the billing records would be redacted for privilege

7     and would involve work product.

8          So at the end of the day you would have how many hours

9     were worked, the attorney that did the work, and the billable

10:43  10     rate, and you would get the general description that is applied

11     to this matter and the matter would be in response to

12     Government's subpoena.

13          When you are looking for the detail, I am not certain

14     that Merrill Lynch should be required to waive any privileged

10:43  15     work product when it comes to disclosing what the specific task

16     was done at each particular point, and I don't think is what

17     the case law requires.

18          I think the case law requires if you participate in an

19     investigation and you incur cost as part of the investigation,

10:43  20     as Merrill Lynch has here, you are entitled to recover those

21     costs.

22          THE COURT:  All right.  So -- I'm sorry.  Have you

23     completed?

24          MR. MCDONALD:  To do that, you are required to present

10:43  25     a certain amount of information.  What Merrill Lynch has

1    presented is exactly what Waknine called for.  If Waknine

2    called for something else, I have no doubt that Merrill Lynch

3    would have presented something else.  But it verbatim follows

4    Waknine said.

10:44   5            THE COURT:  That is debatable.  Well, look, I don't

6    want to get into, you know, a huge debate about it.  It is

7    pretty simple because the record is what it is.  And so it is

8    either the information that has been submitted is sufficient or

9    not, and I mean, to me it is telling that the Government says

10:44   10   you take no position on it, but that is fine.

11            MR. MCDONALD:  Only with respect to the rate, Your

12   Honor.  We believe that this is a reasonable request for

13   restitution and that absolutely restitution should be ordered

14   here as a result of participation in the investigation.  There

10:44   15   is absolutely no evidence that any of these costs came from

16   anything else but response to the Government subpoenas.

17            THE COURT:  That's fine.  So is it the case -- I don't

18   want there to be any ambiguity -- Merrill's position is, the

19   victim, we're not providing any more documentary evidence,

10:44   20   period?

21            MR. MCDONALD:  I will consult briefly with the

22   attorneys for Merrill Lynch if you will permit me, and I'll

23   find that out.

24            THE COURT:  Certainly.  Sure.

10:45   25            One additional question for you, Mr. McDonald, before

1    you respond, as I understood your argument to be that -- your

2    position was that you were taking -- the no position that you

3    were taking was you were taking no position on is the rate, but

4    that was the only position you were saying you are not taking a

10:46   5    position on, that you can't comment to the rate, but everything

6    else is reasonable?

7         MR. MCDONALD:  Everything else appears to follow what

8    would be required in any other restitution hearing.  The

9    expenses detailed in the affidavit and the attachments in the

10:46   10   affidavit appear to follow from the cost of the investigation.

11   That is one of the covered costs under the statute for

12   restitution.

13        There is no doubt that Merrill Lynch participated and

14   assisted in the investigation of the offense.  It was part of

10:46   15   the offense, and so certainly it was specifically limited to

16   whatever Merrill Lynch charges I cannot comment on the

17   reasonableness of the billing rate.

18        THE COURT:  The hourly rate.

19        MR. MCDONALD:  Yes.

10:46   20        THE COURT:  But are you taking a position that the

21   amount sought is reasonable?

22        MR. MCDONALD:  Yes, Your Honor.  We have no reason at

23   this point to question the number of hours that were billed and

24   I have no indication that Merrill Lynch -- and I don't think

10:46   25   this is a suggestion from the defense counsel either -- would

1    have overbilled or that WilmerHale had overbilled for any

2    portion of this.  Not only is it unethical, it certainly

3    wouldn't be put before the court.  You saw in the Southern

4    District of New York cases, it was 6 million, and the Sisco

10:47   5    case it was 7 million, so the costs can spiral quickly.

6         THE COURT:  Is it the position that the Government

7    then is taking the position that the amount sought is

8    reasonable?

9         MR. MCDONALD:  Yes, Your Honor, is a reasonable amount

10:47   10    sought if the Court finds that the billing rate that was

11    charged ultimately and, as I said, it is about $332 an hour for

12    the attorney fee portion is reasonable.

13         THE COURT:  And I understood the possession on to be

14    differently, and I think that understanding was in part based

10:47   15    upon a filing in Document 74.  Do you have Document 74 in front

16    of you?  Do you have 74 there, Mr. McDonald?

17         MR. MCDONALD:  I have it right here, Your Honor.  I

18    do, Your Honor.

19         THE COURT:  Here is my question, if you look at page

10:48   20    10 of 15, lines 18, it says Merrill Lynch provided the

21    probation officer detailed list of expenses incurred, and hours

22    billed in responding to the Government's subpoenas and request

23    for information, Exhibit B at five.  Although the Government

24    takes no position on the reasonableness of the amount sought

10:48   25    for any particular request, the descriptions of these expenses

1    confirms they necessarily arose from the Government's

2    investigation and in furtherance of it.

3            I took that to mean that you were saying, we don't

4    take -- what it says is, you take no position on the

10:48  5    reasonableness of the amount sought.  That seemed inconsistent

6    to me with what you just said.  Am I misunderstanding it?

7            MR. MCDONALD:  Well, Your Honor, as I understood the

8    amount sought was simply a product of the factors that bear on

9    the hours worked and the rate, and I can't take the position

10:49  10    that the hours worked was unreasonable.  I have no reason to

11    think that WilmerHale would overbill for services it is

12    providing to a client.  It is unethical.  I don't think it

13    entered into the calculation.  I can really only refer, as I am

14    trying to articulate, that the rate that is charged --

10:49  15            THE COURT:  So is it the position that you are saying

16    we don't know if the right amount is 3 million, one million,

17    500,000, 6 million, we just don't know?

18            MR. MCDONALD:  No.  We believe the amount claimed is

19    the right amount because it is reasonable in a sophisticated

10:49  20    financial fraud that required hundreds of thousands of pages of

21    document review and over 120,000 pages of documents were

22    produced to the Government that a cost of $4 million would

23    arise.

24            THE COURT:  What did you mean when you said the

10:49  25    Government takes no position on the reasonableness of the

1    amount sought?  I don't understand what you meant by that.  If

2    you are telling me -- what does that mean?

3              MR. MCDONALD:  It means, Your Honor, that the dollar

4    figure that is presented here -- let's take, for instance, on

10:50   5    the exhibit the $2,124,000 for responses to the subpoena.

6    Merrill Lynch said that required 6,231 hours of work, so the

7    amount sought is the 2.124 million.

8              THE COURT:  Is that reasonable or not, or you don't

9    take a position on that?

10:50   10             MR. MCDONALD:  I don't take a position on whether the

11   multiplication of the hours times the rate is --

12             THE COURT:  I can do the multiplication.  That is not

13   an issue.

14             MR. MCDONALD:  I don't take a position on what the

10:50   15   rate should be for this work.  The rate is at the end of the

16   day what the rate is.  If the Court has reasons -- I think this

17   is happened in the Southern District the New York -- if the

18   Court has reason to question the rate charged, if we assigned

19   this out to a CJA attorney, he would only be able to recoup

10:50   20   $150 an hour.

21             THE COURT:  That is not what happened in the Gupta

22   case.  The Court went through the bills and said, well, some of

23   these were okay and some were not okay.  He wasn't looking at

24   redacted bills.  He had to see what was there.

10:51   25             But, anyway, I think we're getting beyond the purposes

1    here.  If the victim's position is this is it, we've complied

2    with the statute, we are not giving any more, the record will

3    be closed, because I am not doing this in stages.  I want to

4    make that perfectly clear, because I have given a fair amount

10:51   5    of time.  And I am not saying I am not going to give more time.

6    That is fine.  They can take the position they want.

7           If it is the case that there are no additional

8    documents that are going to be submitted and you are saying we

9    have somebody here that wants to add to the record, I'll give

10:51   10    them the opportunity to add to the record today.  That is it.

11    I am not going back and -- if they come back next week and say

12    we have more documents, I am not doing that.  I mean, there has

13    to be an end.  They have had plenty of time.

14           And if their position is as a matter of law is this is

10:51   15    it, we don't have to give you anything else, make your ruling

16    based on this, I'll do that.

17           MR. MCDONALD:  Your Honor, I don't represent Merrill

18    Lynch.  I represent the United States.  I have consulted with

19    the representative of Merrill Lynch.  I am happy to have you

10:52   20    hear from them themselves, but my understanding is that they

21    would like to consult with their client in addition to see,

22    based on Your Honor's comments, if there is any additional

23    detail that they can provide.

24           As I said, we believe the information here is

10:52   25    sufficient.  I take Your Honor's comments to heart.  We have no

 1   interest in having two bites at the apple here.  I have no

 2   interest in taking multiple --

 3          THE COURT:  Because there won't be.  They can appear

 4   themselves -- by themselves, if they want to have -- they can

10:52   5   appear by themselves if they want to.

 6          MR. MCDONALD:  With respect to?

 7          THE COURT:  If they want to come and argue the

 8   restitution, if they think the Government hasn't done it for

 9   them, but I am not going to -- I think I am clear that I am not

10:52  10   doing this in stages, and so that if the position is if they

11   want one more -- if they say, look, these other cases suggest

12   that there is a lot more -- I am a little surprised with their

13   position.

14          I thought that what would happen is the Government

10:53  15   would come in and say we agreed; we look at all these cases; we

16   think there probably should be more.  But to the extent that

17   Merrill Lynch -- that you are saying through -- Merrill Lynch

18   has told you, look, this is what we think is good enough, I

19   don't have a problem ruling on it.  It is not a problem for me.

10:53  20          MR. MCDONALD:  My current -- my understanding

21   currently is that Merrill Lynch would like an opportunity to --

22   the attorneys for Merrill Lynch would like an opportunity to

23   consult with their client to see if there is additional detail.

24          Your Honor, should know the Government has pushed for

10:53  25   as much information as we can possibly get for your Court.  We

1   believe that as much information as possible is necessary.  We

2   have the information we have.  We believe it absolutely applies

3   with the standard.  There always can always be more.

4          Is it necessary?  I don't think so, but I could see

10:53   5   the position that it would be helpful.  If Your Honor is so

6   inclined, we would ask for a short period of time to allow

7   Merrill's attorneys to consult with their client, and we can

8   give a final answer whether the record here is closed and

9   whether we believe the Court can go ahead or whether additional

10:54   10   information could be provided that may further illuminate this.

11          Now, at the end of the day I'll take up the position

12   that I have taken before.  I don't think it will change any of

13   the numbers, and I think we'll end up with the tables and the

14   information and the affidavits we have before us supported by a

10:54   15   lot of billing records.

16          THE COURT:  That position is really basically what it

17   says is, look, we told you generally what we did; we told you

18   generally -- not really what we charge, but we told you

19   generally what we did; we told you generally how many hours we

10:54   20   worked; that is good enough.

21          I mean, you want to know exactly what we did, and you

22   want to be able to separated out what we did on -- what was

23   related to Mr. Wang, what was related to the three trades, what

24   was related to other things, we'll tell you generally.  And you

10:54   25   have some concerns about some other things that we may have

1    stuck in there that we're not entitled to; we didn't do that;

2    we didn't do that, and so don't worry about it.

3         MR. MCDONALD:  There is an affidavit under oath to

4    that effect.  It is not simply an off-the-shoulder or

10:55   5    off-the-cuff remark, Your Honor.  There is an affidavit that

6    says these are the costs that arose, and so that is an

7    affidavit under oath that I would take with significant value.

8         THE COURT:  Why doesn't the defendant get to say I

9    don't accept that --

10:55  10         MR. MCDONALD:  The defendant can put on his own --

11         THE COURT:  -- and I want to look at it.

12         MR. MCDONALD:  -- evidence if he so choses.  There is

13   simply nothing at this point that would cause you to question

14   the information provided.  Like I said --

10:55  15         THE COURT:  I understand your position, and they can

16   take whatever legal position they want.  What I am not doing --

17   because this has -- I think that the parties have had fair

18   opportunity to submit things, and I am not doing it in stages,

19   and so you can have one more week, and I'll give you a chance

10:55  20   to go back, talk to the victim, and they can submit whatever

21   additional documents they wish to do, and they can do that

22   by -- is the 27th enough?  Give them another week.  Is that

23   enough?  Why don't you consult with them.

24         MR. MCDONALD:  Sure.

10:56  25         THE COURT:  Really what I think it is going to get

1    down to, it is clear in the other cases billing records were

2    provided.

3              MR. MCDONALD:  Yes, it is.

4              THE COURT:  And the billing records, they have them.

10:56    5    It is not like they have to go create something.  They have

6    them.

7              And really what it gets down to is the decision is

8    what are we prepared to give up?  Are we going to give them up

9    or not?  And that is entirely up to them.  If they want to give

10:56   10   them up, they can.  If they don't, that is fine too.  But it

11   may have an impact on whether they are able to prevail on their

12   request for restitution.

13             But, you know, what they decide to do is up to them,

14   and I think a week is probably enough because they have them.

10:56   15   If it was a decision that they needed to go create them, that

16   is fine, and -- you know, whatever they elect to do they do,

17   but if they want to give a thousand pages but everything is

18   blacked out, that is fine.  I won't be able to use -- how

19   helpful that will be, probably not very helpful.

10:57   20             But I am not going to go back after that and say,

21   okay, now, these weren't that helpful; now give me something --

22   get the record complete.  Everything they want me to rely on,

23   I'll rely on, and then if they say in addition to that we want

24   to have somebody come testify, we'll do that.  Just tell me who

10:57   25   it is, and the other side will have some notice.

61

1          But, you know, it may become problematic if someone

2     says I want to testify but let me tell you about the billing

3     records; I am not going to give them to you, but let me tell

4     you about what is in them.  There may be some issues with

10:57   5     regard to that.

6          But do you want to consult with Merrill Lynch to see

7     if a week is enough?

8          MR. MCDONALD:  This is counsel for Merrill Lynch.

9          THE COURT:  Your name, sir.

10:57  10          MR. CASAMASSIMA:  Good morning, Your Honor.  Chris

11     Casamassima.  I'll spell it.  CASAMASSIMA, from Wilmer Cutler

12     Pickering Hale and Door --

13          THE COURT:  Yes, sir.

14          MR. CASAMASSIMA:  -- representing Merrill Lynch.

10:58  15     Yeah, a week is fine.  We'll go back.  We'll talk -- discuss

16     with the client what, if anything, additional we're prepared to

17     submit, and we'll make that decision, and we'll submit it -- I

18     hear you say a week from today.

19          THE COURT:  Actually, what I envision is the records

10:58  20     would be submitted obviously to the Court and to the

21     defendants, and then I would give the defendants -- and I'll

22     talk to Mr. Hennigan, but I would like to give Mr. Hennigan

23     about two weeks to go through -- to go through what he receives

24     to say, okay, here is our position; we think -- he might say we

10:58  25     agree to pay everything, not likely, but he could say some of

1    these we agree to, some we don't, and here's why; we think

2    these related to A; we think these related to B; we think these

3    related to C; we don't think he get A and C; we think he gets

4    B.

10:58    5    Then the next time we get together it will be the case

6    -- then the argument would be, all right, these are too high;

7    the numbers are okay, but it is the categories that the issue

8    is; they are not related enough to the crime, and so he should

9    only get a portion of them, not all of them; and then, you

10:59   10    know, you and the Government can say, no, under the case law we

11    get everything.

12    At least we're all operating on the same sheet of

13    music.  We know this is what was done and this is what is being

14    requested, and I can apply the law to say, well, you get these

10:59   15    or you don't get these, and everybody has a clear record so

16    that they know this is what is in play.

17    And that is really what is envisioned, that you

18    produce them in a week, and I think a week is enough because I

19    am assuming you have these.  You know, it is not like you have

10:59   20    to create anything new.  The issue is whether or not you are

21    going to give them and under what circumstances.

22    And then the defense would have two weeks for them,

23    and then to say why we think we don't have to pay for these.

24    And then I would give your side, you know, a week to reply to

10:59   25    say, well, here is why you have do have to -- here's why you do

1    have to do it.

2              And then I would get some good briefing on, okay,

3    here's what the issue is.  Because right now I have a lot of

4    briefing -- it is really in general, these categories are not

11:00    5    included, and nobody really knows other than just sort of the

6    summaries, and, you know, there is a debate -- or there may be

7    a debate as to whether or not they are sufficient or not.

8              The defense clearly thinks they are not and they think

9    I should end the process saying you've had plenty of time, that

11:00   10    is just not good enough.  And as I understand your position

11    through the Government is that is good enough and that should

12    be enough, and I don't want there to be any ambiguity so this

13    is sort of the final shot to say the final-final shot; hey, if

14    you want to supplement anything else, I am not doing it -- if I

11:00   15    get a lot of stuff that isn't very persuasive, maybe they will

16    work, maybe not.

17              MR. CASAMASSIMA:  We hear you loud and clear, Your

18    Honor.  I think we understand it, and I appreciate the extra

19    time.  Like, as I said, we'll confer with the client, and we'll

11:00   20    decide what, if anything, else we're prepared to submit, and

21    we'll make the submission next week.

22              THE COURT:  Are you the gentleman prepared to testify?

23              MR. CASAMASSIMA:  I am not.  It is someone from the

24    client.

11:01   25              THE COURT:  Did they travel here?

1           MR. CASAMASSIMA:  From Los Angeles.

2           THE COURT:  Can you give me a general idea what they

3      would like to discuss?  I will give them an opportunity to

4      speak.  I just don't know if today is the best day.

11:01  5           MR. CASAMASSIMA:  Okay.  Well, we prepared an

6      allocution that Ms. Cabrera, there in the audience, would read

7      on behalf of Merrill Lynch that supplies an explanation of the

8      billing process and how charges incurred were isolated for the

9      Jing Wang matter, and she would be happy to read that today.

11:01  10     She is prepared to do that.

11          THE COURT:  And she's prepared to be cross-examined on

12     it?

13          MR. CASAMASSIMA:  No.  We submit that

14     cross-examination would not be appropriate in the context of

11:01  15     witness allocution.

16          THE COURT:  This is just for the fees.  Is this for

17     support in the fees?

18          MR. CASAMASSIMA:  This is an explanation that we think

19     provides additional support for the fee amount, yes.

11:02  20          THE COURT:  But she is not subject to any questioning.

21          MR. CASAMASSIMA:  Yes.  That was our idea --

22     intention.  The victim allocution, like under 3771(a), the

23     victim can read a victim impact statement without being subject

24     to cross-examination.

11:02  25          THE COURT:  I understand, but it seems like -- I don't

1    know.  It is sort of mixed.  On the one hand it is hard for me

2    to decide what is being offered in support of the restitution,

3    and so if you have a lawyer or somebody come from the victim

4    and say, all right, I am here to support our claim for

11:02    5    restitution, and here's what we did, and here's why we did, and

6    there is a dispute, I would have a factual hearing on that.

7          And so there might be an evidentiary hearing where we

8    could resolve the disputes, and so I don't really -- I can't

9    really put in the box, like, what this -- whether the witness

11:02   10    would be, hey, I am here to testify to resolve a factual

11    dispute with respect to what we did and the reasonableness of

12    the fees, in which case something like that, if it is a factual

13    dispute, that would be by the way of an evidentiary hearing.

14          If it is the case that Merrill Lynch -- somebody is

11:03   15    coming forth, hey, I am the victim; this hurt our good name;

16    this hurt -- this disrupted our organization; this -- those

17    things are different, and then, I agree, that is -- somebody

18    can read a statement; they can appear here if they are saying,

19    hey, this is how we've been harmed.

11:03   20          And I guess what I don't -- what is confusing to me a

21    bit is this -- we want to offer a witness who is going to offer

22    support in connection with the amounts of the restitution we're

23    requesting on a disputed factual issue, that being the amount

24    of the restitution, and so that would seem if it is a disputed

11:03   25    factual issue and there is a hearing on it -- which is not

1    unusual that -- I've had hearings on restitution issues, and

2    there has been -- it is just like a hearing, so there is cross

3    examination on it.

4            That is obviously much different than a situation at

11:04    5    the sentencing where somebody wants to go forward and say,

6    here's how I have been harmed; I am a victim, or I am here on

7    behalf of the victim.  And I just didn't completely understand

8    which one it was.

9            Obviously, at the sentencing Merrill Lynch is entitled

11:04    10    to have people come to discuss how they've been harmed.  If it

11    is an issue that you want me to consider that goes to the

12    disputed issue of the restitution, if you want to say, look,

13    our restitution, the amount we want is 3 million, and the

14    defense is saying, no, we think it is a million, we think it is

11:04    15    nothing, there is a factual dispute, then in resolving a

16    factual dispute, I would have a hearing.

17            I mean, you could submit a declaration, but if there

18    was a dispute as to the declaration, then the other side would

19    be given an opportunity to examine the witness on the disputed

11:04    20    paragraphs of the declaration.

21            Do you follow the issues?

22            MR. CASAMASSIMA:  I do, Your Honor.  So, to follow-up

23    on that, if we were to submit something in a week, and engage

24    in the reply to that, and then we get another response to that

11:05    25    the process, would the ultimate result be a hearing?

1    THE COURT:  Maybe not.  It might not be.  It could be

2  the case that, look, if -- if the defendants -- if I feel that

3  the requirements have been met and so there is sufficient

4  support in the record that these were -- these tasks were done

11:05    5  and the amount is reasonable, and it relates to the offense so

6  the restitution should be awarded, then the defendants -- there

7  might not be a factual dispute.

8    The defendants might have a legal dispute.  They might

9  be saying we don't disagree 100 hours were spent on that; we

11:05   10  don't disagree that is a reasonable rate; what we disagree with

11  is you cannot get reward of restitution for the tasks, not

12  covered.  That is a legal issue.  Or it could be they say

13  100 hours; we say it should be ten; I might not need an

14  evidentiary hearing on that either.

11:06   15    Some of the other cases -- I don't know whether there

16  was an evidentiary hearing, and I don't necessarily know that

17  one would be -- that one would be necessary, and so I -- I

18  don't know.  Sometimes we have them.  Sometimes we don't.

19    It just seems that what we're really getting down to

11:06   20  is how much information is, you know, the victim prepared to

21  give in, you know, the attorney issues.  And, you know,

22  sometimes victims, they don't want to give information.

23  I've -- they might say, look, I am not going to do that; I am

24  not going through this; I am not going to give all this

11:06   25  information; I am not going to subject my employees to

1    cross-examination on this, so forget it; I don't want it; I

2    won't do it.

3        And not everybody takes that position.  In different

4    cases they take different positions.  And so, you know, I --

11:07  5    obviously, Merrill Lynch, you are free to make whatever

6    assessment you take as to what information has to be provided,

7    and I just don't want to -- I wanted to give one last chance.

8    I didn't want there to be a case that says the Court came in,

9    looked at it and said not good enough, and the victim never got

11:07 10    a chance to, you know, to respond to do anything.

11        And, you know, as I've indicated, I mean, the

12    defendants clearly think it is not enough and I should say not

13    enough, end of story.  I haven't done that in other cases, and

14    I am not inclined to do it now.  I am not ruling whether it is

11:07 15    enough or not enough.

16        It is clear to me that there are other cases where

17    awards have been given where the billing records have been

18    given, and, you know, the amounts really, you know, that hasn't

19    been an issue there.  There has been some dispute about the

11:07 20    categories but not enough -- not really a dispute about whether

21    this is sufficient.

22        Any questions or anything else on that?

23        MR. CASAMASSIMA:  No.  I think you made the issues

24    plain, Your Honor.

11:08 25        THE COURT:  With respect to the witness, you

1    absolutely -- I just don't think it is productive now to have

2    the witness testify.

3              MR. CASAMASSIMA:  I am hearing your concerns, Your

4    Honor.  I agree, and we will not be putting up -- have the

11:08    5    witness read an allocution.

6              THE COURT:  I just don't know -- in fairness to the

7    witness, I don't know if the witness clearly knows what is the

8    issue.  Is it I am here to testify as a victim as to how we

9    were harmed and I want you to consider this for the sentencing,

11:08   10    which I absolutely would, or is it the case that I want to

11    support the restitution issues?

12              And then if you want to support the restitution

13    issues, that is a little different.  That is a factual -- that

14    very well may be a factual dispute, so maybe that person would

11:08   15    have to be subject to cross-examination, and so -- because the

16    witness is from Los Angeles, and I understand it is not -- you

17    know, it is -- it is not convenient to come here from Los

18    Angeles, but if somebody was here -- had travelled a greater

19    distance and if it was clear to me that -- and clear to you

11:09   20    that, look, this is somebody that they want to talk -- this is

21    a victim impact statement, I would give it now.  There is no

22    cross-examination.

23              I've done that before.  I had the witness testify.

24    There is a transcript of it.  It is in the record.  There is no

11:09   25    need for the witness to come back.  That's it.  I would read it

         1    again before the sentencing.

         2            And so if your position is, look, judge, this is not

         3    on a disputed factual issue, we just want to get our victim

         4    impact statement given now, we'll do it now.  She can testify

11:09    5    now, and I'll have a transcript of it, and we can do that.  But

         6    I just don't know which it is.

         7            So do you want to consult with the witness so she

         8    doesn't have to come back?  If it is a pure victim witness

         9    impact, she can come forward, read it, and put it in the

11:09   10    record, and we'll be done with that.

        11            MR. CASAMASSIMA:  Okay.  Give me one minute to confer.

        12            THE COURT:  Okay.  That's fine.

        13            MR. MCDONALD:  Your Honor, while they are consulting,

        14    can I clarify the procedure you envision?

11:10   15            THE COURT:  Sure.

        16            MR. MCDONALD:  Would we be filing the records if they

        17    would be provided under seal or provided with some

        18    confidentiality to Mr. Hennigan first?  What do you envision as

        19    the mechanism?

11:10   20            THE COURT:  I don't know.  I may.  The parties can

        21    request it.  I don't know if, at the end of the day, it will be

        22    granted or not.  I don't know because -- I don't know.  There

        23    could be requests that could be made, but I don't know that if

        24    it was made initially whether everything would remain under

11:10   25    seal throughout the entire process, so I don't know.

1          MR. MCDONALD:  Okay.  Thank you, Your Honor.

2          THE COURT:  All right.

3          MR. CASAMASSIMA:  Yes, Your Honor.  We've conferred,

4    and we're not going to go ahead with the victim impact

11:10   5    statement today.  We will take the week as you've given us.

6    We'll consider the issue, and I'll make a determination at that

7    time.

8          THE COURT:  All right.  So why don't we do this then,

9    we'll say if Merrill Lynch wishes to produce any additional

11:11  10    documents in support of their request -- and that can be

11    anything else they want to do to support the request,

12    anything -- if they would file that by the 27th, and then the

13    defendants can have until March 13th to then respond.

14          And, in essence, you can crystallize your objections

11:11  15    if you have them to the categories, to the amount, to the

16    descriptions, whatever the objections are, if there are any,

17    file those by the 13th.

18          And then Merrill Lynch and -- is two weeks sufficient

19    time?  I mean, I don't know what you will get.  I don't know if

11:12  20    you will get a piece of paper.  You may get a lot of pieces of

21    paper.  I am anxious to move it along, but I don't want to

22    force people to do something when they need a little bit more

23    time.

24          MR. HENNIGAN:  I think two weeks should be sufficient

11:12  25    time.  The only thing I have in my calendar in March is St.

1    Patrick's day.  I keep it open.

2            THE COURT:  I used to.  I have a trial that starts

3    that day, but that is the way it goes.

4            MR. HENNIGAN:  That may be another reason why we

11:12  5    celebrate that.  There is a question I have as I am listening,

6    we're not sure what, if anything, Merrill might file.  I made a

7    couple of requests for documents from Merrill and from US

8    Attorney's Office, and, frankly, I am not really sure that I

9    have a right to do that because we're in kind of -- for me, at

11:12  10   least, this restitution thing is uncharted territory.

11           But if something comes to mind that there is a

12   $500,000 expense for the internal investigation, I don't know

13   if that really had anything to do with Jing.  I don't want to

14   particularly look at somebody's internal investigation.  I

11:13  15   don't know that I can really count on the face of it, gee, that

16   is probably really related only to Jing or that is really

17   related to their other exposure.

18           I guess I would like some direction from the Court.

19   Am I in a position where I can make some specific requests to

11:13  20   make a determination as to whether this actually has anything

21   to do with us?

22           THE COURT:  I am not aware that you are.  I think it

23   is -- my understanding of it is -- and I certainly will be open

24   to briefing from the sides -- it is that -- the burden is on

11:13  25   the Government on behalf of Merrill Lynch, and they can -- you

1    know, they do what they think they should do to meet the burden

2    and obviously with consultation with the victim.

3         And, you know, the documents will be provided, and

4    then, you know, you can -- you know, if you think there is a

11:13    5    disagreement, you can object.  I just don't think that from

6    reading the cases -- I read a number of the cases on

7    restitution, I just don't think that is that unusual, and that

8    is why I cited to the cases where the billing records

9    apparently have been provided.

11:14    10        MR. HENNIGAN:  There are actually parts of -- excuse

11    me, guys.  There are parts of this case that are a little

12    different than the standard case, because usually like the

13    Gupta case were talking about and the Gordon case, the

14    company comes forward and says, hey, I've done an internal

11:14    15    investigation and we want to tell you guys about it, this is a

16    case that the Government had actually everything finished by

17    February 20th --

18        THE COURT:  But -- excuse me for interrupting.  I

19    think that discussion really should be made, you know, at the

11:14    20    end, you know, or after -- after the record is complete,

21    because then it can be, look, I think that all goes to these

22    fees, you know; it wasn't that complicate the case; they had

23    everything; we shouldn't have to pay all this money.

24        MR. HENNIGAN:  That's fine, but that was going to

11:14    25    segue into the other thing that I would like to see if we can

1    get copies of.  The cases talk about, particularly the Pignano

2    case, the DC Circuit case.  Was this done at the request of the

3    Government, or was this done sort of after they find out about

4    the investigation they start to doing a lot of things?  Some of

11:15    5    it maybe never shared with the Government.  We don't know one

6    way or the other.

7          So if it wasn't shared with the Government, I don't

8    know how it will be in furtherance of the investigation.  I

9    don't know how I will know that from the documents.

11:15   10          THE COURT:  I think what we'll do is take it -- let's

11    get the record.  Let's get the evidentiary record complete

12    first.  Then we'll take it.

13          MR. HENNIGAN:  Then your question is two weeks enough.

14    I think it is.  I have Mr. Rice's help on this, and we'll be

11:15   15    able to get through the two weeks of this, and we'll come back

16    to court.

17          THE COURT:  Let me do this, and we'll set the

18    schedule.

19          MR. CASAMASSIMA:  Your Honor, if I may, I do

11:15   20    apologize.  Reflecting on the fact that if we were to make an

21    additional submission with materials that you would want a

22    written explanation and that would require work, if you would

23    indulge us another week.

24          THE COURT:  Actually -- if you want to do two weeks to

11:15   25    supplement --

1          MR. CASAMASSIMA:  Yes.

2          THE COURT:  -- your restitution request with any

3     documents that you request, so file those by the 6th, so that

4     will be any additional documentary evidence, anything else you

11:16   5     want -- let's get it so the record is complete.  So everybody

6     knows when we're making legal arguments what we're arguing

7     about.

8          And so if you want to file those by the 6th, and then

9     give the defendants two weeks to object or review the new

11:16  10     materials to see, hey, this is why we think we shouldn't have

11     to pay for X, you know -- we should have to pay for X but not

12     Y.  So then you take two weeks.

13          And then I'll give the Government -- I'll give the

14     Government and Merrill Lynch then two weeks to reply, and that

11:16  15     way you can -- you'll have two weeks to formulate to supplement

16     the record any way you wish.  The defense gets two weeks to

17     look at it and say, hey, this is why we think we should have to

18     pay X but not Y.

19          And then you'll have two weeks for a rely, and then

11:16  20     you'll have what they said, and then you'll have what you

21     submitted, and then I think at that point the record is

22     complete.

23          I don't know that there is going to be a need for an

24     evidentiary hearing.  My sense is maybe not.  I think there

11:17  25     will be a need for another argument to go through legally --

1    then I think we can crystallize, all right, legally these types

2    of legal expenses are subject to restitution and these aren't.

3         And, you know, there might be some debate about the

4    number of hours or the rate.  If evidence was necessary on it,

11:17  5    I could take it, but probably not.  My guess is most of these

6    cases there is not a real debate about the rate, and whether

7    something took 10 hours or 20 hours, I can't envision there

8    would be a hearing on that either.

9         MR. CASAMASSIMA:  Thank you, Your Honor.

11:17  10        THE COURT:  Any additional questions?

11        MR. CASAMASSIMA:  Just as a point of clarification, we

12    would, you know, Merrill Lynch is the victim of the Yin and

13    Wang conspiracy as a whole, we would put in a submission for

14    not just the Wang matter but also with respect to the Yin

11:18  15    matter as well.  I don't know if you want us to mix them.

16        THE COURT:  I don't.  That is why I set them

17    separately.  Certainly with respect to the documents, I mean,

18    if you are saying there might be some documents -- or some

19    support that relates to the co-defendant, has nothing to do

11:18  20    with Wang, so you are not requesting that money, so there is no

21    need to give him, you know, to give Mr. Hennigan documents that

22    don't relate to any restitution request, and so I could

23    certainly envision that some of the documents that Mr. Hennigan

24    gets are different because you might be requesting things

11:18  25    against the co-defendant that you are not requesting from

1    Mr. Wang.  So that would be different.  And I imagine the

2    pleadings with respect to Mr. Hennigan would be different as

3    well, because there are some categories that obviously -- it is

4    noted in the papers that you are not requesting against this

11:18    5    defendant as you are against the co-defendant.

6              MR. CASAMASSIMA:  Correct, correct.

7              THE COURT:  So I would recognize that I think the

8    supporting materials would be slightly different and the

9    briefing would be slightly different.

11:19    10              MR. CASAMASSIMA:  I appreciate that.  Understood, Your

11    Honor.

12              THE COURT:  All right.  Any other questions from the

13    Government, Mr. McDonald?

14              MR. MCDONALD:  No.  No additional questions from the

11:19    15    Government, Your Honor.  I think we understand the procedure,

16    and that is fine.

17              THE COURT:  So we're going have to come back one more

18    time at least before we have the sentencing hearing, and

19    obviously we all want to get to the hearing.  I would like to

11:19    20    get to the hearing, but restitution is a significant issue.  It

21    is a significant issue to the victims, so my concern is the

22    victims get everything that they are entitled to under the law

23    but they don't get any more.  They get everything they are

24    entitled to, and this -- it just takes some time.

11:19    25              I rather take the time to make sure that the victim

1    has the absolute fair opportunity to get everything in and the

2    defendants have a fair opportunity to examine it and are in a

3    position to raise their objections so their objections can get

4    ruled on, and there is a record of what I did and why, so that

11:19   5    is my concern.

6          And so it is going to take a little bit longer, but I

7    think it is time well spent because I think it is an important

8    issue.  I recognize it is an important issue to the victim, and

9    it is an important issue to anyone who has to pay it.

11:20   10         I'll set you another date then because all I set so

11   far is two weeks, two weeks, two weeks, and I'll give you

12   another date to come back to discuss it, and it looks like, if

13   the calculations are right, by April 3rd all the briefing

14   should be done.  I think that is six weeks out.

11:20   15         And so why don't we try to say -- to have you back for

16   further discussion and argument on those matters, why don't we

17   say -- does April 17th work?  You want to check your calendars?

18   It is a Friday.

19         MR. CASAMASSIMA:  If my phone rings while I turn it

11:21   20   on, my apologies.

21         THE COURT:  That's fine.

22         MR. MCDONALD:  Your Honor, if possible, we would

23   request April 24th.  I may have a trial in Detroit that may end

24   around April 18th.

11:21   25         THE COURT:  Is it likely to go?

```
 1              MR. MCDONALD:  It is currently scheduled to go.
 2              THE COURT:  There is a lot of things scheduled and
 3       they never --
 4              MR. MCDONALD:  In this case all the other defendants
 5       pled guilty a long time ago, and given the proximity, if the
 6       Court is inclined to give one more week, I think it would only
 7       be a week trial.
 8              THE COURT:  All right.  What about April 24th?
 9              MR. HENNIGAN:  That is acceptable to the defense as
10       well.
11              THE COURT:  The 24th work?
12              MR. VECCHIONE:  Your Honor, Frank Vecchione for Gary
13       Yin, who is set for 1:30.  I was assuming since I was here I
14       should join in.
15              THE COURT:  If the date doesn't work, I'll give you
16       another date.
17              MR. VECCHIONE:  It does work.
18              THE COURT:  Okay.  I kept the cases separate for a
19       variety of reasons.
20              THE COURT:  Does it work for you?
21              MR. CASAMASSIMA:  Yes, Your Honor.
22              THE COURT:  And the Government as well, and why don't
23       we say April 24th at 9:30, so we'll have -- the record will be
24       complete with respect to the restitution, everything that the
25       victim wishes to give.  So we'll have -- the record will be
```

11:21 — line 5
11:21 — line 10
11:21 — line 15
11:22 — line 20
11:22 — line 25

1    complete, and then we can have some objections, any briefing

2    with respect to what is included -- what the defense thinks

3    should be paid, if anything, and their objections as to what

4    things should not be paid, and why.

11:22    5         And then we'll get a reply from Merrill Lynch and the

6    Government as to what should be paid and why, and why the

7    defense -- what they are correct on, if anything, and what if

8    they are incorrect on, if anything.

9         And at that point, Mr. Hennigan, if you want to add

11:22   10    anything to the Guideline argument that you made -- I think we

11    had a good discussion of that, but if you want to add anything,

12    I'll give you a chance to do that.

13         MR. HENNIGAN:  That would be -- the time to file

14    whatever objections, if we do file objections --

11:23   15         THE COURT:  Well, I think the briefing is full on

16    that, is complete on that.

17         MR. HENNIGAN:  Okay.  I understand.

18         THE COURT:  And so my understanding was you wanted

19    to -- because you didn't think that we were going to argue on

11:23   20    that today, if you wanted to argue that again or raise that

21    point again, you could do it on the 24th.

22         MR. HENNIGAN:  I appreciate that.

23         THE COURT:  And then on the 24th then I think the

24    restitution issues should be resolved.

11:23   25         Is that your understanding, Mr. McDonald, that --

1    obviously this is the big issue on restitution?

2          MR. MCDONALD:  Yes, Your Honor.  There is no

3    circumstance where we would be coming back for a second bite at

4    the apple.

11:23    5          THE COURT:  What I meant, there is no other

6    restitution issues with any the other victims.  This is it.

7          MR. MCDONALD:  No.  The restitution was due 60 days

8    from the date of sentencing to come in to make a claim.  We

9    have no information that there were any.

11:23    10          THE COURT:  Fair enough.  What we will do then is --

11    what I set on then the 24th, we'll get all the argument on

12    restitution, then I would set the sentencing date, and then if

13    it is the case that -- well, there is a small chance there

14    could be an evidentiary hearing, but perhaps not.  Let's be

11:24    15    optimistic and hope that there is not.

16          We'll see you back on the 24th.  We'll deal with all

17    the restitution issues we can.  Hopefully we can deal with all

18    of them, and then hopefully I'll be in a position to set a

19    sentencing hearing.  Any questions from anybody?

11:24    20          MR. VECCHIONE:  Yes, Your Honor.

21          THE COURT:  Can those questions be this afternoon?

22          MR. VECCHIONE:  I am just asking whether we'll do the

23    9:30 and 1:30 on the 24th and we're off calendar this

24    afternoon.

11:24    25          THE COURT:  No.  You are on calendar this afternoon.

1    And on that day we may very well keep them separate, your

2    hearing and the co-defendants.

3            MR. VECCHIONE:   Okay.

4            THE COURT:   And I kept them separate, and some of the

11:24   5    issues are slightly different, and what I am trying to avoid

6    with some success, is I don't want to have anybody in the

7    position to say, well, I agree with what he said, or I disagree

8    with what he said.

9            I think that because some of the issues are slightly

11:25  10    different -- there is a lot of overlap.  Some of the issues are

11    different, particularly on the restitution, I think that it

12    best that it be separate.  And the parties haven't all taken

13    the same position on some of the objections.  So I think it is

14    best that it is completely separate.

11:25  15            Then each defendant will have their own record what

16    the was said and what the Court considered so it is clear what

17    pleadings I considered with respect to each defendant, what the

18    arguments were, and there is no overlap or ambiguity in the

19    record of what I considered.

11:25  20            With that, thank you very much for your presentations.

21    Enjoy your weekend.  I look forward to seeing everybody back on

22    the 24th at 9:30.

23            MR. BESTE:   Your Honor, if I could indulge the Court

24    for just a second.

11:25  25            THE COURT:   Sure.

1    MR. BESTE:  Just because the defendant has to get his

2  affairs in order for the sentencing hearing and Mr. McDonald

3  has to fly out from DC, when would you expect us at a

4  sentencing hearing after the 24th, in a couple weeks, just for

11:25  5  planning purposes, around Memorial Day and stuff?

6    THE COURT:  I would like to do it as soon as I can.

7  Part of it will depend how the restitution comes out, what the

8  level of disagreement is.  Obviously there has to be an order

9  that has to be written on the restitution issue.

11:26  10    And I don't know what the range of disagreement is, so

11  I would try to do it as soon as I could, and would I like to do

12  it within 30 days?  Yes, absolutely.  So to the extent that if

13  I can, I would do it as soon as I could.

14    MR. BESTE:  Thank you.

11:26  15    THE COURT:  I am not thrilled it has taken this long.

16  It is not anybody's fault.  There is significant issues and

17  people need time to respond to them, and restitution is a big

18  issue, and so I want to make sure that the record is absolutely

19  clear what I considered and the reasons were for the ruling.

11:26  20    MR. BESTE:  I understand.  Thank you.

21    THE COURT:  Thank you.  Enjoy the rest of your day.

22  Thank you for your appearances, and it has been helpful.

23    (Proceedings concluded at 11:26 a.m.)

24             ---oOo---

25

1                    C-E-R-T-I-F-I-C-A-T-I-O-N

2

3          I hereby certify that I am a duly appointed, qualified

4   and acting official Court Reporter for the United States

5   District Court; that the foregoing is a true and correct

6   transcript of the proceedings had in the aforementioned cause;

7   that said transcript is a true and correct transcription of my

8   stenographic notes; and that the format used herein complies

9   with the rules and requirements of the United States Judicial

10  Conference.

11          DATED:  February 25, 2015, at San Diego, California.

12

13                              /s/ Melinda S. Setterman
                                _____
14                              Melinda S. Setterman,
                                Registered Professional Reporter
15                              Certified Realtime Reporter

16

17

18

19

20

21

22

23

24

25