1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

UNITED STATES OF AMERICA,

CASE NO. 13CR3487 WQH

11

Plaintiff,

ORDER

vs.

12

JING WANG,

13

Defendant.

14

Hayes Judge,

15     The matter before the Court is the objection by Defendant to the amount of gain

16 resulting from insider trading pursuant Section 2B1.4 of the United States Sentencing

17 Guidelines in Paragraphs 17, 21, 23, 26, and 29 of the presentence report. (ECF No. 66

18 at 6-10). The presentence report concludes that a 12 level increase is warranted on the

19 grounds that "the gain resulting from the insider trading is more than $200,000 [in this

20 case $244,167 pursuant to U.S.S.G. §2B1.1(b)(F)(G)]." (ECF No. 63 at 12). The

21 presentence report calculates the gain using the price at the time of sale minus the price

22 at the time of purchase to compute gain for each of the three insider trades detailed in

23 the offense conduct.[1]

24     Defendant does not dispute the purchase prices, sale prices, or the gain at sale

25 from the three trades using insider information in this case. Defendant asserts that the

26 proper calculation of gain is the difference between the purchase price and the value of

27

28     [1]Insider Information #1 gain $94,710, PSR Paragraph 17; Insider Information #2 gain $111,468, PSR Paragraph 21, 23; and Insider #3 gain $37,989, PSR Paragraph 26 and 29.

                         13CR3487 WQH

1   the stock after the insider information is made public, an approach used by the

2   Securities and Exchange Commission in civil insider trading cases, referred to as the

3   "market absorption approach."   Defendant contends that the total gain for the three

4   insider trades using the market absorption approach is $164,231.12[2] which results in

5   an increase of 10 levels pursuant to U.S.S.G. §2B1.1(b)(F).

6        Defendant contends that the calculations in the presentence report do not

7   accurately represent the amount of gain that resulted from trading on the basis of

8   material, nonpublic information. Defendant contends that the approach used in the

9   presentence report includes gain or loss resulting from holding the securities after the

10   insider information is made public and punishes conduct unrelated to the criminal

11   wrongdoing. Defendant Wang contends that the market absorption approach accurately

12   represents the amount of gain that resulted from the criminal conduct of insider trading.

13        The Government contends that the market absorption approach ignores the fact

14   that Defendant maintained a fraudulent advantage over ordinary investors by continuing

15   to own illegally acquired stock.  The Government asserts that the Defendant continued

16   to violate Qualcomm policies by holding and then later selling his illegally acquired

17   shares.  The Government asserts that Defendant has not provided evidence to support

18   his claim that the market had absorbed the insider information.

## APPLICABLE LAW

20        Section 2B1.4(b)(1) of the United States Sentencing Guidelines **Insider Trading**

21   states:  "If  the gain resulting from the offense exceeds $5,000, increase by the number

22   of levels from  the table in §2B1.1 (Theft, Property Destruction, and Fraud)

23   corresponding to that amount."  The  Commentary to Section 2B1.4 states:

24        <u>*Background*</u>: This guideline applies to certain violations of Rule 10b-5 that

25        are commonly referred to as "insider trading". Insider trading is treated
essentially as a sophisticated fraud. Because the victims and their losses

26        are difficult if not impossible to identify, the gain, i.e., the total increase
in value realized through trading in securities by the defendant and persons

27        acting in concert with the defendant or to whom the defendant provide

28        [2]Insider Information #1 gain $14,322; Insider Information  #2 gain $111,919.26; and
Insider #3 gain $37,989.94.

inside information, is employed instead of the victims' losses.

U.S.S.G. § 2B1.4 Commentary.

In *United States v. Mooney*, 425 F.3d 1093 (8th Cir. 2005), Mooney was the vice president of underwriting for United Healthcare Corporation. Mooney opened a margin account in 1990 at a brokerage house and used it solely to invest in United stock. In 1995, United entered into negotiations to acquire Metra. During the due diligence inquiries, Mooney directed his stockbroker to sell his United stock and used part of the proceeds to purchase call options in United stock. Mooney subsequently sold his call options at a profit months after the public announcement of United's acquisition of Metra. Mooney was found guilty of "knowingly devising and engaging in a scheme to defraud United and its shareholders through his[] sale of United common stock and his subsequent purchase and sale of United call options, all while in possession of material nonpublic information concerning United's negotiations to acquire Metra." *Id.* at 1098.

At sentencing, the district court found that the gain resulting from the offense was the amount realized by the sale of Mooney's United call options. On appeal, Mooney asserted that a market absorption approach should be borrowed from civil insider trading cases to interpret the guidelines. Mooney asserted that the market would have reasonably absorbed his insider information two days after United announced its Metra acquisition well before his eventual sale of the call options. The Government opposed this approach asserting that this "standard to measure gain is inherently speculative and would require the sentencing court to identify the point at which material nonpublic information is fully assimilated by the market." *Id.* at 1099.

The Court of Appeals concluded that "the guidelines refers to the defendant's gain, not to market gain, and it ties gain to the defendant's offense. It speaks of gain that has resulted, not of potential gain." *Id.* at 1009. The Court of Appeals found that the civil law theory presents an imprecise standard particularly inappropriate in the criminal context and concluded that the commentary makes clear that gain is the total profit

actually made from a defendant's illegal securities transactions." *Id.* at 1100.

In dissent, Judge Bright explained that the offense referenced in Section 2B1.4 "is not the purchase of stock itself, but the *use of a manipulative or deceptive contrivance in connection with* the purchase. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10(b)-5." *Id.* at 1106. Judge Bright concluded that the "'gain resulting from the offense' is not the gain resulting from the purchase. It is rather the gain resulting from the deception." *Id.* Judge Bright concluded that the interpretation of the guidelines adopted by the majority did not adequately provide uniformity of sentences for similarly situated defendants. Using an example of three individuals who bought stock at the same time, with the same insider's knowledge at the same price, but held the stock for different periods of time after the insider information was publicly disclosed resulting in different gain after sale, Judge Bright explained:

> Larry, Moe, and Curly committed the same crime, with the same effect on the market. If the "gain resulting from the offense" were the gain from the deception, the Guidelines would suggest the same increase (of two levels) over the base offense level for Larry, Moe, and Curly. See U.S.S.G. § 2B1.4; § 2B1.1(b). On the court's interpretation, however, Larry would receive a two-level increase, for a $10,000 gain, Moe a six-level increase for a $45,000 gain, and Curly no increase at all, because he lost money on the purchase. *See id.* If these increases were applied to a base offense level of 17 for a defendant with a criminal history category of I, as in Mooney's case, they would translate into additional minimum prison time of six months in Larry's case, a year and ten months in Moe's case, and no additional time in Curly's case. As I have noted above, the court's interpretation means unequal justice for equal crimes.

> As the Supreme Court has recently said, the basic purpose of the Guidelines "was to move the sentencing system in the direction of increased uniformity," a uniformity that consists of "similar relationships between sentences and real conduct[.]" *Booker*, 125 S.Ct. at 761. It is unreasonable to apply the Guidelines in a way that would lead to such disparate sentences for similarly situated defendants whose real conduct was identical. Such an application would create a through-the-looking-glass inversion of the Guidelines—advising unequal sentences for identical crimes—defeating the chief purpose of the Guidelines.

425 F.3d at 1007.

In *United States v. Nacchio*, 573 F.3d 1062 (10th Cir. 2009), Defendant Nacchio was convicted of nineteen counts of insider trading covering trades he made from April 26, 2001 to May 29, 2001; he was acquitted of twenty-three counts covering earlier

trades.  At sentencing, the district court used the total net profit from the stock sales during the April-May 2001 time period as a starting point.  The district court subtracted the amount withheld for taxes and concluded that the "true gain" was "the total increase in value realized through trading." *Id*. at 1069.   Nacchio asserted on appeal that "includ[ing] for sentencing purposes the total amount he made on the stock sales as gain is punishing him for the normal appreciation in... shares..., which had nothing to do with the offense charged... Nacchio assert[ed] that the "market absorption" approach should be utilized." *Id*. at 1069.

The Court of Appeals stated:

> we conclude that the district court's gain computation approach does not square with the plain language of the relevant guideline, U.S.S.G. § 2F1.2, and its commentary; therefore, we reject it. We further determine that it was incumbent upon the district court to adopt a realistic, economic approach (1) that would take into account that Mr. Nacchio's offense did not inhere in his sale of the shares itself, but in the deception intertwined with the sales due to his possession of insider knowledge, and (2) that consequently would endeavor to compute his gain for sentencing purposes based upon the gain resulting from that deception.

*Id*. at 1071-1072.  The Court of Appeals concluded that "the general application instructions in the [Guidelines] support the circumscription of the gain computation to that gain resulting from the deceptive nature of the action." *Id*. at 1073.  The Court of Appeals concluded that the approach taken by the district court failed to exclude unrelated market factors from the gain computation.  "Nacchio's increased prison sentence should be linked to the gain actually resulting from the offense, not to gain attributable to legitimate price appreciation and the underlying inherent value of the [] shares." *Id*. at 1075.

The Court of Appeals found that the disgorgement approach from civil jurisprudence provides the appropriate approach "[b]ecause it seeks to strip the wrongdoer of ill-gotten gains and deter improper conduct." *Id*. at 1079.  The Court of Appeals explained:

> The plain language of § 2F1.2 supports the notion that an insider trading defendant's "gain" should not consist of the total amount that the defendant realized from his or her stock sales, but should be limited more specifically to the gain that resulted from trading with insider knowledge.

13CR3487 WQH

Section 2F1.2(b)(1) prescribes an increase corresponding to "the gain resulting from the offense." The essence of the offense of insider trading is not the trading itself—standing alone, a lawful act—but trading on the basis of insider information. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b5–1(a); *cf. Mooney*, 425 F.3d at 1105 n. 9 (Bright, J., dissenting) ("[T]he plain language of the statute makes it clear what 'the offense' is.").

In other words, a corporate insider who trades without knowledge of material, nonpublic information is not committing the offense; nor is a corporate insider who has such inside information but does not trade while possessing it. Both elements—knowledge and deceptive action—are necessary to complete the offense. ...

Because mere trading does not constitute criminal insider trading, it logically follows that any gain associated with lawful trading should not be considered gain as used to increase a prison sentence. *Cf. United States v. Yeaman*, 194 F.3d 442, 456–57 (3d Cir.1999) ("[T]he plain meaning of 'resulted from' connotes causation.") (alteration in original) (internal quotation marks omitted) (discussing the Guidelines calculation of a loss amount under § 2F1.1 based on " 'all harm that resulted from the acts and omissions specified' ") (quoting U.S.S.G. § 1B1.3 (1997)). As the *Mooney* dissent explained:

> [I]t is not enough to define "gain." We then must know what "the offense" is, because the guideline does not look to "gain" simply, but to the "gain resulting from the offense." Indeed, simply to take the definition of gain without limiting it to gain "resulting from the offense" would lead to absurd results. It is not all the defendant's stock gains—over an entire lifetime of stock trading, perhaps—that count[ ], but only the stock gains "resulting from the offense."

*Mooney*, 425 F.3d at 1105 n. 9 (Bright, J., dissenting).

*Id.* at 1072-1073.

In *United States v. Rajaratnam*, 2012 WL 362031 (S.D.N.Y. 2012), Defendant was convicted of conspiracy to commit and the commission of various insider-trading schemes after selling his shares of stock on negative inside information. The Government calculated the gain "by taking the difference between the price at which a security was purchased (or sold short) on the basis of insider information, and the price at which it was later sold (or covered) following the relevant public announcement, and then multiplying by the number of shares." *Id*. at *1. Rajaratnam offered an alternative methodology through an expert witness which purported to "isolate the price increase or decrease in a company's stock attributable to the public announcement of inside information regarding a company from the price increase or

decrease attributable to events that happened to coincide with the announcement." *Id.* at \*2.

The district court examined the conclusion of the Court in *Nacchio* that "an insider trading defendant's 'gain' should not consist of the total that the defendant realized from his or her stock sale, but should be more limited  specifically to the gain that resulted from trading with insider information."   573 F.3d at 1072.  The district court rejected the reasoning in *Nacchio* that "a single trade can be divided into 'trading with insider knowledge' and trading on the bases of public information." *Id.* at \*6.  The district court explained that "measuring insider trading gains based on the value of the inside information misinterprets 'offense' because it rests on the false premise that insider trading has legal and illegal parts for purposes of that term." *Id.* at \*6.  However, the district court agreed with Judge Bright that the concerns for uniformity in sentencing must limit the gain calculation in the guidelines to gain resulting from the offense of insider trading and avoid the ups and downs of the stock market unrelated to the insider knowledge.  The district court explained:

> The core of [Judge Bright's] disagreement with the *Mooney* majority was that section 2B1.4 refers not only to the defendant's "gain" but to his "gain resulting from the offense." Judge Bright reasoned that a court "cannot know what the 'gain resulting from the offense' is, without first knowing what 'the offense' is." *Id.* at 1105 (Bright, J., dissenting). Judge Bright went on to point out that the offense in Section 10b–5 "is not the purchase of stock itself, but the use of a manipulative or deceptive contrivance in connection with the purchase." *Id.* at 1106 (quoting 15 U.S.C. § 78j(b)) (emphasis in original).  Based on that definition of "the offense," Judge Bright reasoned as follows:

>> The gain resulting from the deception stops when the deception stops, though there may be later gain (or loss) as the stock market gyrates along, unmolested by any deception. If someone buys stock illegally on the basis of insider knowledge, there may be an increase in the stock's value when the insider knowledge is made public. That increase is illicit, resulting from a kind of deception to the other buyers and sellers of the stock. After the market adjusts to this information and the deception is ended, the value of the stock will, of course, continue to fluctuate according to the ordinary, legitimate vagaries of the market—with no deception—and thus, no offense under 15 U.S.C. § 78j—involved. Thus, if the person holds the stock for another five years after the insider knowledge has been made public,

1
2

> the value of the stock will continue to rise or fall regardless of the prior deception.
> *Id.*

3
4
5
6

Judge Bright also concluded that, "[e]ven if the plain language of the statute did not clearly tell us what 'the gain resulting from the offense' is," the *Mooney* majority's conclusion would "not promote uniformity." *Id.* "To the contrary," in Judge Bright's view, the majority's position "could result in unequal sentences for equal crimes." *Id.* at 1106–07. To make that point, Judge Bright used a series of examples similar to those discussed in the previous subsection. *See id.* at 1107.

7
8

As applied to measuring gains based on stock price movements after the announcement of inside information, Judge Bright's reasoning is persuasive in a way that the *Nacchio* court's is not.

9
10
11
12
13
14

Again, in a nutshell, the *Nacchio* court's reasoning rests on the false premise that a single trade can be divided into "trading with insider knowledge" and trading on the basis of public information. Where inside information is a factor in a defendant's decision to trade, that person has committed a crime. In deciding to do so, the defendant assumes the risk that factors beyond his or her control—here market conditions—will exacerbate the seriousness of that crime. And where the essence of the crime is gaining a risk-free advantage over other investors, there is nothing unjust about punishing a defendant when the very risks his crime enabled him to avoid have come to pass.

15
16

However, the core of Judge Bright's dissent is that once the inside information has become public the insider has lost his illegal advantage. That vitiates the justification for saddling a defendant with market risks.

17

*Id.* at *9-10.

18

## RULING OF THE COURT

19
20
21
22
23

In this case, the Defendant was a senior executive at Qualcomm, Inc., an issuer of securities under the federal securities laws.  Qualcomm's shares of common stock were traded on the NASDAQ Stock Exchange.  In March 2006, Defendant instructed his Merrill Lynch broker to "set up a company as Unicorn in the [British Virgin Islands] [to act as a nominal account  holder] and to make it appear that [his brother] was the beneficial owner of the company."  (Plea Agreement, ECF No. 59 at 5).

24
25
26
27

In or about March 2006, [Defendant] opened a new Merrill Lynch brokerage account in Unicorn's name (the Unicorn account").  To create this account [Defendant] provided documents to [his broker] that gave the false impression that [his brother] would be the beneficial owner of the Unicorn Account.

*Id.*

28

In 2008, Defendant was designated as an officer of an issuer under Section 16 of the Securities Exchange Act of 1934. "Because of [Defendant's] senior position at Qualcomm, he was subject to certain restrictions involving the purchase and sale of Qualcomm securities, in part due to his access to confidential business information." *Id.* at 4. "On or before March 1, 2010, because of his position at Qualcomm, [Defendant] learned material, non-public information... (Insider Information #1) ... at a closed meeting of Qualcomm's Board of Directors." *Id.* On March 1, 2010, "soon after the Insider Information #1 was discussed at the Qualcomm Board meeting," Defendant called his broker and instructed his broker to "use all of the assets in the UNICORN account to purchase Qualcomm stock." *Id.* The broker purchased 7,700 shares of Qualcomm stock in the Unicorn account at $36.07 per share.

> This trade by [Defendant] violated Qualcomm's Insider Trading policy, as the company's "trading window" was closed. And [Defendant] was not permitted to execute trades in Qualcomm stock during this time. Both [Defendant] and [his broker] knew that [Defendant] was required to report his trades in Qualcomm stock to the company (pursuant to corporate policy) and to the U.S. Securities and Exchange Commission ("SEC") (pursuant to federal securities law). In violation of these requirements, and in contrast to previous trading in Qualcomm stock by [Defendant], both [his broker and Defendant] did not report this trade to Qualcomm or the SEC. [Defendant] willfully caused these trades and did so with an intent to deceive by using material non-public information he obtained as a result of his position at Qualcomm, thereby breaching his duty to Qualcomm and its shareholders.

*Id.* at 6.

The public announcement of the insider information was made on March 1, 2010. "By the end of the next trading day, Qualcomm's stock price had traded as high as $39.50-an increase of over 10% from the pre-announcement price." (Presentence Report, ECF No. at 6). On March 2, 2010, the stock closed at $ 37.93. Defendant's gain to the end of the day on March 2, 2010 was $14,322. Over the next ten months until the sale in December 2010, the stock closed at a low of $31.96 on July 2, 2010 to a high of $49.73 on December 30, 2010. (ECF No. 66-3 at 5-9). Defendant sold the stock at $48.37 per share on December 30, 2010, in order to complete the trade with insider information #2. The price appreciation upon the sale of the stock was a result

1  of the initial appreciation at the time the non-public information came out on March 2,

2  2010, and continued appreciation during the remainder of 2010.

3      Three trades based upon insider information form the basis of the offense

4  conduct.  The difference between the calculation of gain in the presentence report and

5  the calculation of gain by the Defendant results from the March 2010 stock purchase

6  based upon insider information referred to in the presentence report as the Insider

7  Information #1.  Defendant contends that the proper calculation of gain from Insider

8  Information #1 is gain measured from the purchase of the stock on March 1, 2010 until

9  March 2, 2010, the end of the trading day when the inside information became public,

10  resulting in a gain of $14,322.[3]  Probation and the Government contend that the proper

11  calculation of gain from Insider Information #1 is gain measured from the purchase of

12  the stock on March 1, 2010 until the Defendant's sale of the stock on December 30,

13  2010 resulting in a gain of $94,710.

14      U.S.S.G. Section 2B1.4 directs the court to increase the base offense level by the

15  number of levels in §2B.1.1 based upon "the gain from the offense."  U.S.S.G. §

16  2B1.4(b)(1).  This provision of the Guidelines reference the offense committed by this

17  Defendant in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. §240.10b-5.   15 U.S.C.

18  Section 78j(b) states that "It shall be unlawful for any person, directly or indirectly...

19  (b) to use or employ, in connection with the purchase of sale of any security ... any

20  manipulative or deceptive device or contrivance in contravention of such rules and

21  regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).

22      Two significant criminal sentencing issues guide the courts in an attempt to

23  properly calculate the gain under U.S.S.G. § 2B1.4.  Courts seek to limit "the gain

24

25      [3] The court does not make a factual finding that the market had taken into account
   the full value of the insider information by the close of the trading on March 2, 2010.
26  However, the Court accepts the Defendant's position that the stock price information
   in the record (Ex. B to the Hennigan Declaration ECF No. 66-3 at 5-9) is sufficient to
27  establish that the full value of the insider information would have been taken into
   account before any rise in the stock price that would support a gain figure of more than
28  $200,000 pursuant to U.S.S.G. § 2B1.1(b)(1)(G).  See also ECF No. 109.

figure resulting from the offense [to] exclude[] to the extent possible within the institutional constraints of criminal sentencing, factors unrelated to the defendant's criminally culpable conduct" *Nacchio*, 573 F.3d at 1080.  In addition, the courts seek to avoid application of the Guidelines "in a way that leads to [] disparate sentences for similarly situated defendants whose real conduct was identical."  *Mooney*, 425 F.3d at 1107, Bright, dissent.

In this case, Defendant admitted as a factual basis for his plea of guilty to 15 U.S.C. Section 78j(b) that the March 2010 stock purchase was based upon insider information.  Holding the stock after the insider information was disclosed to the public lead the court to the conclusion that any of the gain from the rise in the stock price was lawful gain.  Defendant was required to disclose all of his purchases under the SEC regulation and did not disclose the purchase of this stock at any time.

In this case, Defendant violated the law by making the purchase based upon deception.   Defendant then held the stock unlawfully until he sold the stock for the purpose of engaging in another insider transaction.  However, the guideline direct the court to increase the base offense level by the gain from the offense of the deception of insider trading, that is, the use of a "manipulative or deceptive contrivance in connection with the purchase."  15 U.S.C. § 78j(b).  As Judge Bright explained:

> The gain resulting from the deception stops when the deception stops, though there may be later gain (or loss) as the stock market gyrates along, unmolested by any deception. If someone buys stock illegally on the basis of insider knowledge, there may be an increase in the stock's value when the insider knowledge is made public. That increase is illicit, resulting from a kind of deception to the other buyers and sellers of the stock. After the market adjusts to this information and the deception is ended, the value of the stock will, of course, continue to fluctuate according to the ordinary, legitimate vagaries of the market—with no deception—and thus, no offense under 15 U.S.C. § 78j—involved. Thus, if the person holds the stock for another five years after the insider knowledge has been made public, the value of the stock will continue to rise or fall regardless of the prior deception.

*Id.*

While no part of the Defendant's conduct relating to the December 2010 purchase and sale of the Qualcomm stock was legal conduct, the Court concludes that the gain

13CR3487 WQH

calculation under U.S.S.G. § 2B1.4 must be limited to the gain resulting from the deception of trading with insider knowledge in order to avoid an unreasonable application of the guidelines.  Including gain from holding the stock after the insider information was publicly disclosed in violation of Qualcomm policies would result in different sentences for the same violation of law based solely upon the market conditions during the period prior to sale contrary to the  goals of the Sentencing Guidelines.  *See United States v. Booker*, 543 U.S. 220, 253 (2005) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity.").  For the same reasons that Guidelines would not require a decrease in a sentencing range pursuant to U.S.S.G. § 2B1.4 when market factors unrelated to the insider knowledge caused the stock price to decrease, it is not reasonable to increase the sentencing range pursuant to U.S.S.G. § 2B1.4 when market factors unrelated to the insider information caused the stock price to increase.  The Court finds that the proper measure under Section 2B1.4 is the gain that resulted from trading with insider knowledge.   The sentencing guideline range cannot move up or down based upon movement in market price of the stock unrelated to the deception forming the offense conduct. The record shows by a preponderance of the evidence that the total gain resulting from the three insider trades is more than $120,000 and less than $200,000.   The Court will apply the 10 level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(F).  Defendant's objection to the gain calculation at Paragraph 56 of the presentence report is sustained.

DATED:  April 29, 2015

**WILLIAM Q. HAYES**
United States District Judge